**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William Robert WOOLERY,**
**Defendant-Appellant.**

**No. 83–2606**
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

June 20, 1984.

Rehearing and Rehearing En Banc
Aug. 21, 1984.

Lewis Dickson, Houston, Tex., for defendant-appellant.

Daniel K. Hedges, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before JOLLY, HIGGINBOTHAM and DAVIS, Circuit Judges.

PER CURIAM:

Defendant William Robert Woolery appeals his conviction of a single count of attempted possession with intent to distribute cocaine.

## I.

The transaction which forms the basis for the conviction began when customs officials discovered cocaine in a shipment of saddles from Colombia.[1] The addressee was a "Richard Freedman," and a telephone number was given. After an airline official left word with the answering service at that telephone number, a man identifying himself as Freedman[2] telephoned the airline and told them the package would be picked up that day. Freedman had the W.R. Zanes Warehouse pick up and store the package. He then telephoned Suburban Delivery Company to arrange for collection of the package from the Zanes Warehouse. Lawrence Lopez, a driver for Suburban Delivery, was sent by his dispatcher to the parking lot of a Denny's restaurant near the warehouse to meet Freedman and receive his instructions.

---

1. A more detailed recitation of the facts appears in *United States v. Woolery*, 670 F.2d 513, 514–5 (5th Cir.1982) (reversal of order granting defendant's motion to suppress evidence obtained after illegal arrest).

2. Though a voice print analysis showed that the person who telephoned was not Woolery, the man who met Lopez in the parking lot was Woolery, although he responded to the name of "Richard Freedman." In setting forth the facts, the name "Freedman" will be used to refer to Woolery when he used the alias for the meeting with Lopez. Elsewhere, Woolery is Woolery.

According to Lopez's trial testimony, he arrived at the parking lot fifteen or twenty minutes early, and waited in his pickup truck with his son for forty-five minutes until a man approached the driver's side of the truck. Lopez said, "Mr. Freedman?," and the man replied, "Yes."

Lopez got out of the truck and stood two to three feet from Freedman as they spoke. Freedman paid Lopez in cash for delivery and storage services, instructed him to deliver the package to a Houston address, obtained a receipt, and left. It was early afternoon, shortly after lunchtime.

Witnesses testified that Lopez then moved his delivery truck to the warehouse, and was followed by a dark Mercedes with two occupants. When Lopez came to a stop, so did the car, parking across the street. The driver got out of the car, walked around to the front and raised the hood, as if to check the engine. However, according to the testimony, the driver never took his eyes off Lopez's truck. Lopez then moved the delivery van to the rear of the warehouse, and again the car followed, parking within sight of both.

When Lopez entered the warehouse, he was met by police who informed him that the package contained contraband and that he was "in trouble," according to Lopez's testimony. At this point, officers obtained a description of Freedman from Lopez, and the delivery address (which was that of the telephone answering service). They placed Freedman and his companion under arrest, and arranged a line-up for Lopez and his son at the nearby customs office. The sequence of events at the line-up was as follows: first, Lopez entered the line-up room and selected a man who was not Woolery. DEA agent Perry asked Lopez if he was sure, and Lopez stated that he was not. Second, Lopez's eleven-year-old son who had been with him in the parking lot stepped to the door. Within the hearing of his father, he pointed to the defendant Woolery as the man in the parking lot.

Third, an agent then asked Lopez again if he was sure about his selection, and encouraged him to take another look. It was then that Lopez, Sr., selected Woolery as the man he had met in the parking lot who had identified himself as Freedman.

At trial, Lopez and his son both identified Woolery as the man they had seen in the Denny's parking lot. Lopez recalled the description he had given the officers that day, stating that the man was five-feet-seven- or five-feet-eight-inches tall, with a beard and mustache, wearing a white shirt, blue jeans, and brown boots. Lopez stated that his in-court identification of Woolery was based both on what he had seen in the line-up and what he recalled from the day in the parking lot.

The jury found Woolery guilty of the attempted possession with intent to distribute count, and acquitted him of the cocaine importation count. 21 U.S.C. §§ 846, 841(a)(1), 952. Woolery was sentenced to four years in prison, followed by a special parole term of three years. Woolery is currently free on bond, which was continued on appeal at his sentencing. Woolery filed a timely notice of appeal.

## II.

Woolery raises two issues on appeal. First, he argues that the line-up identification by Lopez was impermissibly suggestive and resulted in a substantial likelihood of irreparable misidentification. Second, he argues that the evidence was insufficient to support a verdict of attempted possession with intent to distribute. For the reasons set forth below, we find both contentions without merit and affirm his conviction.

## III.

### A.

Woolery argues that the line-up was impermissibly suggestive [3] because agents' conduct suggested that Lopez had made a

---

3. Woolery argued for suppression of the identification prior to trial and during the trial. His pre-trial motion to suppress on this basis was denied, and his attempts to have the identification excluded during trial were unsuccessful.

mistake the first time and should try again. Woolery also maintains that the line-up procedure was unduly coercive in the light of Lopez's statement on cross-examination that he had been threatened with jail and that he felt that he could "go free" if he could identify the right person. Woolery argues further that under *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the identification evidence is excludable because it is unreliable, based on the totality of the circumstances, and would result in a substantial likelihood of misidentification.

■ Though we agree that the identification procedure was unnecessarily suggestive, we do not feel that its reliability was so impaired as to mandate its exclusion from trial under *Manson*. Admissibility of identification evidence is governed by a two-step analysis enunciated in *Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir. 1981), *cert. denied*, 455 U.S. 1022, 102 S.Ct. 1722, 72 L.Ed.2d 141 (1982). The first step is to determine whether the identification procedure was impermissibly suggestive. The encouragement by agents for Lopez to "take another look and see if you can be sure" came on the heels of his son's selection of the defendant within the hearing of Lopez. Though there is nothing improper in asking an uncertain witness to look at a line-up a second time, it is unacceptable to do so in a way that indicates to the witness whom he should select. The conclusion that the line-up was suggestive is supported further by the agents' insinuations that the witness and his son were "in trouble."

■ Determination of suggestiveness does not end the inquiry. The second step of the *Manson* analysis requires inquiry into:

> whether under the totality of the circumstances the suggestiveness leads to a substantial likelihood of irreparable misidentification .... Under this analysis "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d

140 (1977). Thus, an identification found to be reliable will be admitted even though the confrontation procedure was suggestive.

*Passman v. Blackburn*, 652 F.2d at 569.

■ Six factors have been identified in this circuit for evaluating the risk of misidentification. According to *United States v. Atkins*, 698 F.2d 711, 713 (5th Cir.1983), they are:

> (1) the opportunity of the witness to view the criminal, (2) the witness' degree of attention, (3) the accuracy of the description, (4) the witness' level of certainty, (5) the elapsed time between the crime and the identification, and (6) the corrupting influence of the suggestive identification itself.

■ The reliability of the identification must be assessed with reference to these six factors: (1) Lopez's opportunity to view Freedman occurred "at close range under good light for several minutes." *Allen v. Estelle*, 568 F.2d 1108, 1114 (5th Cir.1978). Lopez stood two to three feet from Freedman, face-to-face, in broad daylight. Though Lopez did not testify precisely how long their transaction lasted, it was long enough for Freedman to pay his bill, tell Lopez where to leave the package, and obtain a receipt. Conditions here were superior to those in *Manson*, where the witness saw the defendant through an open doorway as he stood in a hallway illuminated by natural light. 432 U.S. at 100–1, 97 S.Ct. at 2246. (2) At the time of the meeting in the parking lot, Lopez had no reason to see Freedman as anything but another client. Thus, his attention was probably not particularly focused, compared to, say, the attention of the bank teller being robbed in *Atkins*. (3) Lopez's description was detailed and came minutes after his meeting with "Freedman" in the parking lot. The photograph of the line-up reveals the description was accurate, both as to facial hair and clothing. (4) Lopez was uncertain at the first viewing of the line-up. The man he chose the first time closely resembled the defendant as to height, facial hair, and hairline. The defendant was

standing the farthest away from the witness in the office where the line-up took place. Lopez exhibited certainty at trial that Woolery was the man he had seen in the parking lot. (5) The line-up took place the afternoon of the meeting and arrest. "We do not have here the passage of weeks or months between the crime and the viewing" of the line-up. *Manson*, 432 U.S. at 116, 97 S.Ct. at 2253–4. (6) It is difficult to assess the corrupting influence of the suggestive identification, since Lopez admitted that his in-court identification was a product of both the line-up and the initial meeting. However, at trial, Lopez explicitly identified Woolery as the man he had "met at Denny's and who acknowledged that he was Richard Freedman."

Under the "totality of the circumstances" test, there is ample basis for concluding that the identification was a reliable one. We cannot say there was a very substantial risk of irreparable misidentification, a necessary element of a due process violation. *See Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). Therefore, the district court properly admitted the identification testimony of Lopez.

### B.

■ Woolery's second contention on appeal is that the evidence was insufficient to sustain the conviction for attempted possession with intent to distribute under the sufficiency of the evidence standard of *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc). Woolery's argument hinges largely on his contention that "at no time did the Defendant Woolery ever state that he was 'Mr. Freedman,'" thus no connection was established between Woolery and the contraband, and its ultimate destination. Therefore, "a reasonable trier of fact" could not conclude that Woolery was guilty beyond a reasonable doubt.

Woolery's argument must fail, particularly in the light of Lopez's testimony that the defendant answered affirmatively to the inquiry, "Mr. Freedman?" *Bell* does not require that "the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except guilt, provided a reasonable trier of fact could find guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d at 549; *United States v. Sneed*, 705 F.2d 745, 749 (5th Cir.1983) (citations omitted). Viewing the evidence most favorably to the government, *United States v. Chanya*, 700 F.2d 192, 195 (5th Cir.1983), we conclude that a reasonable trier of fact could find that Woolery attempted to possess the cocaine with intent to distribute it. As this court stated in its earlier opinion, finding probable cause to arrest Woolery, the agents "witnessed the suspect engaging in activity centering on known contraband, activity that had no legitimate or logical explanation." *United States v. Woolery*, 670 F.2d 513, 516 (5th Cir.1982) (reversed district court's order granting motion to suppress evidence obtained after illegal arrest).

■ Similarly, Woolery's contention that his actions did not constitute a criminal attempt under *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir.1974), is without merit. *Mandujano* requires that the defendant have engaged in conduct "which constitutes a substantial step toward commission of the crime" before an attempt conviction is allowed to stand. *United States v. Mandujano*, 499 F.2d at 376. In other words, "mere preparation" for criminal activity is not sufficient to sustain an attempt conviction. *See United States v. Oviedo*, 525 F.2d 881, 885 (5th Cir.1976). On these facts, Woolery's involvement in the delivery of the cocaine to its ultimate destination took him beyond "mere preparation." The goal in *Oviedo* is that objective acts of the defendant without regard to *mens rea* "mark the defendant's conduct as criminal in nature. The acts should be unique rather than so commonplace that they are engaged in by persons not in violation of the law." *Id.* Only then may an attempt conviction stand.

Here, use of two delivery services, use of answering machines, and the conspicuous

surveillance by Woolery and his companion of Lopez's delivery truck constitute precisely the type of "objective acts" which mark Woolery's conduct as criminal in nature, and evidence "commitment to the criminal venture and corroborate the mens rea." *Id.*

### III.

The conviction of one count of attempted possession with intent to distribute is

AFFIRMED.