**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Stacey Lynn MERKT and John B. Elder, Defendants-Appellants.**

No. 85–2264.

United States Court of Appeals, Fifth Circuit.

July 17, 1986.

court should include the stipulated amount of attorney's fees for the trial and appeal in the new judgment.

952

Stephen Cooper, Michael E. Tigar, St. Paul, Minn., for defendants-appellants.

Steptoe & Johnson, Anthony J. LaRocca, Washington, D.C., for amicus curiae-Int'l Human Rights Law Group.

Paul L. Hoffman, ACLU Foundation of Southern Cal., Los Angeles, Cal., for amicus-Texas Civil Liberties Union & ACLU Cal.

Robert J. Erickson, Atty., Dept. of Justice, Washington, D.C., James R. Gough, Jr., Susan L. Yarbrough, Asst. U.S. Attys., Houston, Tex., Mervyn Hamburg, Atty. Appellate Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before WILLIAMS, GARWOOD, and JONES, Circuit Judges.

EDITH HOLLAN JONES, Circuit Judge:

In August 1984, Jose Andres Mendez-Valle and Maria Calletano Rosales-Cruz, El Salvadoran citizens, along with three El Salvadoran juveniles (hereinafter collectively referred to as "illegal aliens" or "aliens") left El Salvador.[1] Having reached Saltillo, Mexico, by bus, Mendez-Valle contacted relatives in Washington, D.C., who instructed him to remain in Mexico until further notice. Several weeks later, two American women came and took the aliens to a church in Matamoros, Mexico, near the Rio Grande River. The aliens spent the night at the church and, the following morning, a man escorted them to the river and directed them to cross at a point where the appellant, John B. Elder, was waiting on the other side.

Once in the United States, Elder drove the illegal aliens to the self-styled sanctuary, Casa Oscar Romero, in San Benito, Texas, where they remained for approximately fifteen days. While at Casa Oscar Romero, Mendez-Valle occasionally saw Elder, who directed the house, and also became acquainted with the appellant, Stacey Lynn Merkt, a volunteer there, when Mendez-Valle gave her money to buy the aliens bus tickets to Houston.

In the early morning hours of November 21, Mendez-Valle was given five bus tickets. Merkt drove the aliens to the bus station in McAllen, Texas, where they were directed to the proper bus. Enroute to Houston, the bus stopped in Weslaco. There, U.S. Border Patrol agents boarded the bus to check for illegal aliens. Mendez-Valle, Rosales-Cruz, and the three juveniles were arrested, given *Miranda* warnings, and taken to the Border Patrol station in Mercedes, Texas. There, the agents learned that the aliens might have been smuggled into the United States. Accordingly, after initial processing, the aliens were sent to the Anti-Smuggling Unit in McAllen.

At the Border Patrol station in McAllen, Mendez-Valle generally described and later identified both Elder and Merkt. Rosales-Cruz was not able to identify either defendant from a photographic line-up.

Elder was indicted, charged, and convicted of two counts of conspiracy, two counts of bringing in and landing illegal aliens, in violation of 8 U.S.C. § 1324(a)(1), and two counts of transporting illegal aliens, in violation of 8 U.S.C. § 1324(a)(2).[2] Merkt, in-

---

1. We recite the facts, as we must, in the light most favorable to the government and the jury's verdict. *See United States v. Alvarado Garcia*, 781 F.2d 422, 423 & n. 1 (5th Cir.1986).

2. Section 1324(a) sets forth the conditions under which persons can be found liable for bringing in and harboring illegal aliens:

 Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

 (1) brings into or lands in the United States, by any means of transportation or

otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise; [or]

 (2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;

 \* \* \* \* \* \*

dicted on one conspiracy count and two substantive transportation counts, was found guilty only of the conspiracy count. The appellants challenge their convictions on numerous grounds which we, after careful consideration, reject.

## I.

### FREE EXERCISE CLAIM

█ Appellants contend that their convictions are barred by their religiously motivated "sanctuary" activities for El Salvadorans, which give rise to first amendment immunity from punishment for violating 8 U.S.C. § 1324.

American society extols its tradition as a haven for those to whom obligations of piety and conscience rank higher than the goods of this world. The tradition, at one level, was embodied in the "free exercise" clause of the Bill of Rights. While respecting the rights of citizens to adhere to different religions, however, it has never been doubted that the government's duty to all may, in some circumstances, encroach upon the practices of a few. Appellants Merkt and Elder seek sanctuary in the "free exercise" clause against their violation of national border control laws. This court, whose sanctuary power is rigidly controlled by precedent, cannot grant their request.

The Supreme Court in *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), noted that the free exercise clause

embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissi-

ble end, unduly to infringe the protected freedom.

*Id.* at 303–04, 60 S.Ct. at 903, 84 L.Ed. at 1218 (footnote omitted). Following this dichotomy, a significant body of Supreme Court law has explained that legislation, religiously neutral on its face, may regulate the health, safety, and general welfare of the public, or certain activities within the purview of the federal government, even if individuals will thereby be penalized because the practice of their religious doctrine violates the law. *See Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965, 970 (1963). *See, e.g., Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (Sunday closing laws); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (child labor laws); *Davis v. Beason,* 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890) (voter registration laws); *Reynolds v. United States,* 98 U.S. 145, 8 Otto 145, 25 L.Ed. 244 (1878) (polygamy laws). In *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), the Supreme Court found unconvincing a "free exercise" claim to exemption from compulsory military service by petitioners who conscientiously objected only to the Vietnam war. The government held an overriding interest in raising armies, and the exemption was theologically neutral. *Id.* at 462, 91 S.Ct. at 842–43, 28 L.Ed.2d at 188. In *Goldman v. Weinberger,* —— U.S. ——, 106 S.Ct. 1310, 1314, 89 L.Ed.2d 478, 485 (1986), the Court, relying on the special needs of the armed forces for uniformity and discipline, upheld a religiously neutral Air Force regulation the effect of which was to forbid an orthodox Jewish serviceman to wear a yarmulke.

The lower federal courts have consistently refused to create free exercise havens from violation of the national criminal laws against use and sale of marijuana. *See United States v. Rush,* 738 F.2d 497, 511–13 (1st Cir.1984), *cert. denied,* —— U.S.

any alien ... not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law

relating to the immigration or expulsion of aliens shall be guilty of a felony....

8 U.S.C. § 1324(a)(1), (2).

——, 105 S.Ct. 1355, 84 L.Ed.2d 378 (1985); *United States v. Middleton*, 690 F.2d 820, 824–26 (11th Cir.1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1497, 75 L.Ed.2d 929 (1983); *Leary v. United States*, 383 F.2d 851, 859–61 (5th Cir.1967), *rev'd in part and remanded on other grounds*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). Likewise, criminal laws prohibiting destruction of government property, *United States v. Allen*, 760 F.2d 447, 453 (2d Cir. 1985), extortion, *United States v. Starks*, 515 F.2d 112, 124 (3d Cir.1975), *aff'd in relevant part sub nom. Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), racketeering, *United States v. Dickens*, 695 F.2d 765, 772–73 (3d Cir.1982), *cert. denied*, 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983), and refusal to testify before a grand jury, *Smilow v. United States*, 465 F.2d 802, 804–05 (2d Cir.), *vacated and remanded on other grounds*, 409 U.S. 944, 93 S.Ct. 268, 34 L.Ed.2d 215 (1972), have been enforced against pleas for preferment based on "free exercise". The basis for these decisions was the conclusion that "the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15, 25 (1972).

Enforcement of 8 U.S.C. § 1324 cannot, consistent with this authority, brook exceptions for those who claim to obey a higher authority. The prohibition on the landing and transport of illegal aliens represents but one facet of the comprehensive legal framework governing entry into the United States and admission to its citizenship. The importance of the prohibition is reflected in the criminalization of conduct, as opposed to milder enforcement sanctions. Control of one's borders and of the identity of one's citizens is an essential feature of national sovereignty.[3] Relinquish this control and it may fairly be said that there remains no territorial or social body which can be called a sovereign nation. The peace, order, and very existence of society are bound up in its border control laws as much as in its criminal and conscription laws. Although their scope and application may be justly criticized, there can be no doubt that, until Congress changes the border control laws, they must be uniformly obeyed. On this basis alone, the first amendment challenge of Merkt and Elder to their convictions fails.

The appellants urge us to apply the analysis of *Wisconsin v. Yoder* and *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) to their case, which would require examining the extent of the burden imposed on their religious practices, the interest of the government in uniform law enforcement, and the likelihood that the government could enforce its policy by other, less intrusive means. At the outset, we note that in *Lee* the government prevailed, even under this analysis, in requiring the Amish, against their religious dictates, to contribute to the federal Social Security system. Moreover, *Yoder* and *Lee* explicitly excluded from their analysis legislation governing the public safety, peace, and order. Despite the Court's recent fragmentation of opinions in *Bowen v. Roy*, —— U.S. ——, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), the controversy there focused on whether to apply *Yoder* or a less-stringent standard to the collision between a free exercise claim and the receipt of federally funded welfare benefits. Justice Burger's opinion for the plurality in result, favorably cited *Reynolds*, which earlier rejected a free exercise challenge against laws prohibiting polygamy, and was not disputed on this point. Nevertheless, in an abundance of analytical caution, we reach the same result even under the *Yoder* test.

---

**3.** The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956, 961 (1953). *See also Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50, 56 (1977).

First, it is not clear to us how enforcement of 8 U.S.C. § 1324 unduly burdens appellants' free exercise of religion. *See Braunfeld,* 366 U.S. at 606–07, 81 S.Ct. at 1147–48, 6 L.Ed.2d at 568–69. The statute relates only to conduct that aids or shelters illegal aliens and contains no explicit prohibition on religious practices or beliefs. The sincerity of appellants' religious motivation to aid El Salvadorans was not doubted by the trial court. Whether such motivation, in turn, required defiance of the nation's border control laws, hence, whether enforcement of those laws so as to inhibit and punish appellants burdened their religious practice, is another matter. Representatives of Catholic and Methodist clergy testified at the pretrial hearing and at trial. None suggested that devout Christian belief mandates participation in the "sanctuary movement." Obviously, appellants could have assisted beleaguered El Salvadorans in many ways which did not affront the border control laws: they could have collected and distributed monetary and other donations, aided in preparing petitions for legal entry and assisted El Salvadorans legally in this country, or, in the Christian missionary tradition, they could have performed their ministry in El Salvador or neighboring countries where El Salvadorans are refugees. They *chose* confrontational, illegal means to practice their religious views—the "burden" was voluntarily assumed and not imposed on them by the government.

Second, contrary to appellants' assertions, there is a compelling state interest in the government's uniform enforcement of border control laws. The statute under which appellants were convicted is part of a comprehensive, essential sovereign policy. We cannot engraft judicial exceptions to the illegality of transporting undocumented El Salvadorans without thereby de facto revising, for the unique benefit of El Salvadorans, the legal conditions under which they may abide in this country. This result would create a preference utterly at odds with the fine balancing of national-origin quotas, visa preference tables, and alien residency requirements promulgated and enforced pursuant to the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. §§ 1101–1524 *passim.* The interest in uniform application of a facially neutral criminal law is acute: "To encourage individuals to make their own determinations as to which laws they will obey and which they will permit themselves as a matter of conscience to disobey is to invite chaos." *United States v. Moylan,* 417 F.2d 1002, 1009 (4th Cir.1969), *cert. denied,* 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970). Finally, we emphatically reject appellants' suggestion that because enforcement of the border control laws has not been particularly successful, there is no compelling state interest in prosecuting violators. The argument is so broadly couched that it could be used to deny a compelling state interest in enforcement of the criminal drug laws. In any event, to the extent that appellants' conduct, amplified by the nationwide publicity given to the "sanctuary movement," has contributed to undermining compliance with the border control laws and encouraging illegal entries, appellants are trying to excuse their violation of law on the basis of other violations. This will not do. The compelling state interest becomes more compelling in proportion to the increasing magnitude of the violations.[4]

The third prong of the *Yoder* test requires consideration of any less restrictive alternative means whereby the appellants' interest in upholding their religious beliefs may be accommodated within government policy. Appellants assert that criminalizing their efforts to abet the illegal entry of El Salvadorans is "almost never" the least restrictive means. They suggest as "less restrictive" the deportation of the alien or even confiscation of vehicles. Deporting the aliens, as an alternative policy, would

---

4. It is unnecessary to speculate whether, in abstract terms, illegal immigration can be judged good or bad for the country. Congress has determined the distinction between entry which is legal and that which is illegal. Neither appellants nor this court can be so bold as to revise the legislative determination.

reduce appellants' efforts to a pitiful farce. It would also implicate the Border Patrol in a wasteful "catch-me-if-you-can" scheme that would not further the law's objectives. Confiscation of vehicles would be a futile remedy, imposing a tax on those who contribute to Merkt's and Elder's efforts, without, in all likelihood, diminishing the quantity of their efforts to evade the law. In short, appellants' proffered "less restrictive alternatives," by their very triviality, highlight the necessity for criminal sanctions.

An even more basic objection to requiring the government to adopt a less restrictive alternative that would protect the appellants' choice of religious practices is the open-endedness of their demand. Judge Head eloquently captured the ramifications of appellants' position in the following analysis:

> If the Government attempted to accommodate into its immigration policy [appellants'] religious beliefs, the Government's efforts would result in no immigration policy at all. As testimony from [appellants'] witnesses indicated, the moral obligation to assist others crosses religious and denominational lines. These widely-held beliefs allow adherents to exercise considerable discretion and would permit religious individuals to form personal immigration policies.... [Appellants wish] to limit this Court's view solely to the violence in El Salvador; however, the human condition remains miserable in many parts of the globe. Man's inhumanity to man, as well as nature's, has been unrelenting throughout history. Many people live on this planet who logically are no less worthy of.[appellants'] Christian charity than the Salvadorans. The consciences of other religiously motivated may conclude that the starving and impoverished of North Africa, Asia, or Mexico are equally entitled to enter this country without review by the INS.

*United States v. Elder,* 601 F.Supp. 1574, 1579 (S.D.Tex.1985).[5]

Appellants' "do it yourself" immigration policy, even if grounded in sincerely held religious conviction, is irreconcilably, voluntarily, and knowingly at war with the duly legislated border control policy. In this case, the claims of conscience must yield to the twin imperatives of evenhanded enforcement of criminal laws and preservation of our national identity as defined by the immigration laws.

## II.

### SUGGESTIVE IDENTIFICATION PROCEDURES

Elder and Merkt next assert that Mendez-Valle's pretrial and in-court identifications were inadmissible because the photographic identification procedures were impermissibly suggestive and created a substantial risk of misidentification.[6] Prior to trial, the appellants moved to suppress the photographic identification evidence. After an evidentiary hearing, the district court found that the photo array of male suspects was not unnecessarily suggestive. With respect to Merkt, however, the court found the photo array to be "disastrous." The court nevertheless held that Mendez-Valle's identification of Merkt was sufficiently reliable to outweigh the corruptive effect of the suggestive photographic array. At trial, Mendez-Valle made in-court identifications of both appellants.

 Evidence of a pretrial photographic identification will be inadmissible only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968). Elder asserts that the male photo array was impermissibly suggestive because his photograph was the only one that even

---

**5.** Judge Vela adopted Judge Head's opinion in denying the appellants' motions to dismiss.

**6.** Rosales-Cruz was unable to identify the appellants from the photographs and could not identify them at trial.

remotely resembled the very general description given by Mendez-Valle at the outset of the interview. We are unable to conclude that the district court was clearly erroneous in its determination that the male photographic array was not unnecessarily suggestive. *See United States v. Diecidue,* 603 F.2d 535, 565 (5th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980).

At the Border Patrol station in McAllen, Mendez-Valle described the man who had met and transported them to the Casa Oscar Romero as a tall man with a mustache who possibly wore glasses and had a name phonetically similar to "Mr. Mack" or "Mr. Yack." (Elder is known as "Jack.") Mendez-Valle also indicated that, while in Mexico, he was aided by a religious organization. Based on this information, the agents compiled a photographic lineup. Because the agents did not have access to a regular photograph of Elder, they clipped his picture from a newspaper and included in the lineup pictures of other men also taken from a newspaper. In addition to the seven newspaper clippings were four "hard" photos of men, three of whom appeared to be of Hispanic descent.

Even excluding the four "hard" photographs, the remaining seven newspaper clippings depicted caucasian males of varying facial and feature characteristics but of the same general age and description. Three of the men in the newspaper clippings wore glasses, while two had mustaches. Mendez-Valle testified that no one suggested any certain photograph to him but that he pointed out Elder's photograph because "that looked very much like Mr. Mac." Based on these facts, the male photographic array was not impermissibly suggestive.

The female photographic array consisted of eight "hard" photographs. Seven of the photographs were in color and depicted women of obvious Hispanic origin. Merkt was the only caucasian female in the array and her photograph was in black and white. The government concedes that the female photographic array was impermissibly sug-

gestive. Nevertheless, the district court found that other factors weighed in favor of the reliability of Mendez-Valle's identification of Merkt and outweighed the effects of the impermissibly suggestive photo identification. We agree.

In *Simmons,* the Supreme Court held that if a photo array was unnecessarily suggestive, the court must then determine whether, under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification. 390 U.S. at 384–86, 88 S.Ct. at 971–72, 19 L.Ed.2d at 1253–54. Under this analysis, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977). *See United States v. Cueto,* 611 F.2d 1056, 1063–64 (5th Cir.1980). A pretrial identification found to be reliable will be admitted despite an impermissibly suggestive photographic array.

■ This Circuit relies on six factors to determine the reliability of a pretrial identification: (1) the opportunity of the witness to view the suspect, (2) the witnesses' degree of attention, (3) the accuracy of the pre-identification description, (4) the witnesses' level of certainty, (5) the time that has elapsed between the crime and the identification, and (6) the corrupting influence of the suggestive identification itself. *United States v. Woolery,* 735 F.2d 818, 821 (5th Cir.), *reh'g denied,* 740 F.2d 359 (1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1172, 84 L.Ed.2d 322 (1985). "[T]he fact that some, or even a majority, of the *Manson* factors weigh against the reliability of the identification is not conclusive. We must examine all of the factors and decide, whether, on the whole, the suggestiveness of the line-up created a 'very substantial risk of misidentification.'" 740 F.2d at 360–61 (quoting *United States v. Atkins,* 698 F.2d 711, 713 (5th Cir.1983)).

■ 1. **The opportunity to view the suspect.** Mendez-Valle testified that he saw Merkt a few times at the Casa Oscar Romero, that he asked her to purchase five bus tickets, and that he gave her $100.

Mendez-Valle further testified that, on November 21, 1984, Merkt gave him five bus tickets and drove the aliens to the bus station, which was approximately twenty minutes from Casa Oscar Romero. Mendez-Valle had the opportunity to view Merkt during the day at close range for substantial periods of time. *See, e.g., Woolery,* 735 F.2d at 821; *Passman v. Blackburn,* 652 F.2d 559, 570 (5th Cir. 1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1722, 72 L.Ed.2d 141 (1982); *Allen v. Estelle,* 568 F.2d 1108, 1113–14 (5th Cir.1978).

2. **Degree of attention.** Mendez-Valle presented Merkt with what was probably a great deal of money to him. Merkt was the individual who paved the way for the aliens' journey to Houston. From these facts, we can conclude that Mendez-Valle's attention was often singularly focused on her. *See, e.g., Passman,* 652 F.2d at 570–71; *Swicegood v. Alabama,* 577 F.2d 1322, 1328 (5th Cir.1978).

3. **The accuracy of the pre-identification description.** Mendez-Valle described Merkt as a short Anglo or light-skinned woman with curly or kinky yellowish-blond hair. He said her name was phonetically similar to "Daisy." Although perhaps general in terms of providing a "measuring stick" for comparison, this was an accurate description of Merkt. Mendez-Valle did, in addition, provide an accurate description of Merkt's car. *See, e.g., Allen,* 568 F.2d at 1114.

4. **The witness' level of certainty.** Mendez-Valle testified that he picked Merkt's picture from the lineup "[b]ecause it looked very much like [Daisy]." At the evidentiary hearing, in response to a question by the court, Mendez-Valle testified that, even if he had not seen the picture of Merkt, he believed he would have been able to identify her. At trial, Mendez-Valle pos-

itively and unequivocally identified Merkt. *See, e.g., United States v. Jennings,* 528 F.2d 222, 223 (6th Cir.1975). *Cf. Cueto,* 611 F.2d at 1064 (no in-court identification of the defendant).

5. **The time between the crime and the confrontation.** Mendez-Valle was asked to describe Merkt and identify her photograph only hours after the aliens had been placed on the bus. *See, e.g., Allen,* 568 F.2d at 1114. Thus, there was no substantial passage of time which could have affected the reliability of the identification.

Virtually all of these factors indicate a reliable basis for the identification. Because the suggestive photographic array did not create a substantial risk of an inaccurate identification, the pretrial identification evidence against Merkt was properly admitted.

■ Under the totality of the circumstances, Mendez-Valle's in-court identifications of Elder and Merkt were reliable also. Mendez-Valle testified as to the length of time he spent with each appellant and the conditions under which he viewed them. At trial, Mendez-Valle said that Elder resembled the man who had helped them and he positively identified Merkt. Defense counsel challenged the basis for both the pretrial and in-court identifications during his closing arguments. The credibility of those identifications was properly left to the jury. *See United States v. Fernandez-Roque,* 703 F.2d 808, 814 (5th Cir.1983).[7]

### III.

### RECUSAL OF THE TRIAL COURT JUDGE

Prior to trial, Elder and Merkt moved for the recusal of the trial court judge, the Honorable Filemon B. Vela, pursuant to 28 U.S.C. §§ 144 and 455. The motion was

---

7. The appellants also assert that the identification procedures were impermissibly suggestive because Mendez-Valle and Rosales-Cruz were shown a video tape in which the female dominantly portrayed was Merkt. This video tape was only shown to the aliens after Mendez-Valle had already described Merkt and picked her photo from the lineup and after Rosales-Cruz

was unable to identify either Elder or Merkt. After viewing the video tape, Rosales-Cruz was still unable to identify anyone on the tape and Mendez-Valle again identified Merkt. In light of these facts, and our finding that the pretrial identification procedures were reliable, we cannot conclude that the video tape had any effect on the ability of the aliens to identify Merkt.

denied by Judge Vela initially and upon reconsideration. On appeal, appellants assert that Judge Vela abused his discretion in refusing to recuse himself because (1) he had acknowledged his personal bias by recusing himself, upon his own motion, in another case in which Elder was the defendant, and (2) he improperly considered the truth of the matters alleged in affidavits submitted under § 144 rather than merely passing upon the legal sufficiency of those affidavits.

■ A motion for recusal is committed to the sound discretion of the trial judge. The denial of such a motion will not be reversed on appeal unless the judge has abused his discretion. *See United States v. Harrelson,* 754 F.2d 1153, 1165 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985). Under both § 144 and § 455, the alleged bias or prejudice must be personal and it must stem from an extrajudicial source which would result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. *See United States v. Reeves,* 782 F.2d 1323, 1325 (5th Cir.1986).

■ Judge Vela's disqualification was not required under § 455 merely because he voluntarily withdrew from another case in which Elder was the defendant.[8] *See, e.g., Davis v. Fendler,* 650 F.2d 1154, 1163 (9th Cir.1981). Judge Vela gave no reason for his withdrawal from that case, other than to state that it was "for none of the reasons urged by the Defendant in his Motions." In this case, Judge Vela considered, and specifically rejected, recusal based on his prior recusal. The appellants have not shown, by affidavit or otherwise, that Judge Vela's impartiality might reasonably be questioned or that he had a personal bias or prejudice against either Elder or Merkt or in favor of the government. These facts do not indicate that a reasonable person would harbor doubts about Judge Vela's impartiality based solely on his prior recusal. *See Phillips v. Joint Legislative Comm.,* 637 F.2d 1014, 1019–20 (5th Cir.1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982).

■ Section 144 provides, in pertinent part:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

28 U.S.C. § 144. If an affidavit filed under § 144 is timely and technically correct, the factual allegations must be taken as true for purposes of recusal. The trial judge may pass only upon the legal sufficiency of the affidavit;[9] he may not consider the truth of the matters asserted therein. *Joint Legislative Comm.,* 637 F.2d at 1019 & n. 6.

■ Merkt, in her affidavit, refers primarily to statements and rulings made by Judge Vela during her trial and sentencing in a previous case.[10] These prior judicial

---

**8.** Under § 455(a), a judge must disqualify himself in any proceeding in which "his impartiality might reasonably be questioned." Under § 455(b)(1), a judge must also disqualify himself where he has a "personal bias or prejudice concerning a party." If the evidence shows that a reasonable person "would harbor doubts about the judge's impartiality," the trial judge must disqualify himself. *Potashnick v. Port City Constr. Co.,* 609 F.2d 1101, 1111 (5th Cir.) *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980).

**9.** An affidavit is legally sufficient if it meets a three-part test: (1) the facts must be material and stated with particularity; (2) the facts must be such that, if true, they would convince a reasonable person that bias exists; and (3) the facts must show that the bias is personal, rather than judicial, in nature. *Joint Legislative Comm.,* 637 F.2d at 1019. *See Parrish v. Bd. of Comm'rs,* 524 F.2d 98, 100 (5th Cir.1975) (*en banc*), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). Each party may submit only one such affidavit. 28 U.S.C. § 144.

**10.** *See United States v. Merkt,* 764 F.2d 266 (5th Cir.), *reh'g denied,* 772 F.2d 904 (1985).

rulings, however, offer no basis for recusal; they do not show any personal bias against Merkt. Elder's affidavit asserts prejudice on the basis of Judge Vela's prior recusal. We have already rejected this ground. Additional allegations center on the statements made by Judge Vela during the previous trial and sentencing of Merkt. Again, these prior judicial rulings do not show any personal bias.

■■■ Finally, the appellants assert that Judge Vela should have recused himself because of religious pressure. In support of this contention, Merkt refers to the affidavit of Diane Elder, the wife of John Elder. Diane Elder's affidavit violates the one-affidavit rule of 28 U.S.C. § 144 and need not be considered. *See United States v. Balistrieri*, 779 F.2d 1191, 1200 & n. 6 (7th Cir.1985) (a court need only consider the first affadavit submitted in support of a § 144 motion), *cert. denied*, —— U.S. ——, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986). Even if its filing were appropriate, Diane Elder's affidavit, based, as it is, on information told to her by unnamed individuals who did "not feel capable of giving affidavits," is legally insufficient to require the recusal of Judge Vela on religious grounds. *Id.* at 1199 (affidavits based on mere conclusions, opinions, or rumors are legally insufficient to require recusal). *See also Davis v. Comm'r*, 734 F.2d 1302, 1303 (8th Cir.1984).[11]

## IV.

### COERCED TESTIMONY

The appellants timely moved to dismiss the indictment based on government coercion and misconduct. On appeal, the appellants contend that their fifth amendment right to due process was violated when the district court failed to hold an evidentiary hearing on the voluntariness of the testimony of the alien witnesses.

It is established in this Circuit that "the admission at trial of a coerced out-of-court statement from a non-defendant may violate the defendant's right to a fair trial as guaranteed by the due process clause of the fifth amendment." *Merkt*, 764 F.2d at 274. *See also United States v. Chiavola*, 744 F.2d 1271, 1273 (7th Cir.1984); *LaFrance v. Bohlinger*, 499 F.2d 29, 35 (1st Cir.), *cert. denied*, 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674 (1974). The voluntariness of the statement of a witness is generally determined in a pretrial suppression hearing. *See, e.g., Merkt*, 764 F.2d at 273; *LaFrance*, 499 F.2d at 36. Here, however, defense counsel indicated that he wished to carry the motion with the case, and testimony was presented at trial regarding the voluntariness of the statements of Mendez-Valle and Rosales-Cruz.

The appellants first assert that Mendez-Valle's testimony was coerced with promises that he and the children would be sent to Washington, D.C., if he testified favorably to the government. At the outset of his testimony, Mendez-Valle stated that he wanted to request a "condition" from the government. At that point, the jury was excused and the proceedings continued. Mendez-Valle stated that, when he was detained, the government promised him that the children would be reunited with their parents in Washington, D.C. The government denied making any such promise but acknowledged that, when Mendez-Valle had asked what would happen to the children, he had been told that the children would be held until their parents could be located. At the time of trial, the children remained in the government's custody because no one had come forward to accept responsibility for them. Mendez-Valle stated that no other promises or threats had been made and the court ordered him to testify. On cross-examination, Mendez-Valle stated his belief that if he gave the Border Patrol agents answers that they liked, they would

---

11. Both appellants also incorporate, by reference, the affidavits of other individuals in support of their motion for recusal. In addition to violating § 144's one-affidavit rule, we note that these affidavits are also predicated on Judge Vela's religious background and his rulings in Merkt's previous trial, evidence no personal bias or extrajudicial prejudice, and are legally insufficient to require recusal.

let them go to Washington, D.C. However, Mendez-Valle elsewhere indicated that, despite this belief, he nevertheless told the truth.

 Appellants assert, based on the fact that the border patrol agents told the alien witnesses the names of the appellants, that the government impermissibly suggested specific testimony. While the agents did inform the alien witnesses of the names of the appellants, this was done only after the witnesses had described the appellants, after Mendez-Valle had picked both of the suspects from the photographic arrays, and after the aliens had both given the agents their phonetic understanding of the names of the individuals who had helped them.

The facts presented at trial did not warrant an evidentiary hearing. Neither witness claimed that he or she was threatened or coerced into making untrue statements. Other than concern for the children, both witnesses testified that no promises were made in exchange for their testimony. Furthermore, even if one of the government agents did bang his fist on the table twice while questioning Rosales-Cruz, as suggested by defense counsel, such actions would not lead this court to conclude that the entire trial testimony of the aliens should be excluded. In *United States v. Fredericks*, 586 F.2d 470 (5th Cir.1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979), the defendant moved to exclude the testimony of an unindicted codefendant. The witness' testimony was obtained in violation of her *Miranda* rights and, according to the witness' uncontroverted testimony, only after being subjected to threatening and heavy-handed interrogation. *Id.* at 477. Refusing to exclude the witness' testimony, this court held that the actions of the government officials, "even if viewed in the worst possible light, were a far cry from the sort of third-degree physical or psychological coercion that might prompt us to disregard altogether

the societal interest in law enforcement by excluding the highly probative testimony of a nondefendant." *Id.* at 481. In this case, we can find no reason to exclude the trial testimony of the alien witnesses.

## V.

## EVIDENCE OF A PRIOR CONVICTION

Merkt was previously convicted of conspiring to transport, and of transporting, illegal aliens. *See Merkt*, 764 F.2d at 268.[12] That conviction was the subject of a motion *in limine*, which was granted to the extent that the government was required to get permission from the court prior to introducing evidence of that conviction. While cross-examining one of the defense witnesses, the prosecutor elicited testimony regarding the previous conviction without prior approval of the court. The district court summarily found the conviction admissible under Fed.R.Evid. 404. The court carefully admonished the jury, however, as to the purposes for which the conviction could be considered. Merkt challenges the introduction of the prior offense evidence.

 Rule 404(b) provides that evidence of other crimes is not admissible to prove the character of a person in order to show that she acted in conformity therewith, but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The admissibility of extrinsic evidence is determined in light of the two-part test established by this court in *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978) (*en banc*), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979): (1) it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character, and (2) the evidence must possess probative value that is not substantially outweighed by its un-

---

12. On appeal, this court reversed that conviction and remanded the case for a new trial. *Merkt*, 764 F.2d at 275. On remand, the government

elected not to retry Merkt and dismissed the indictment.

due prejudice.[13] A trial court's decision to admit extrinsic offense evidence will be rejected only for an abuse of discretion. See *United States v. Maggitt,* 784 F.2d 590, 597 (5th Cir.1986).

■ Merkt first asserts that admission of evidence of the prior conviction was improper because the government was trying to establish her identity. This assertion is frivolous. The trial court, in admonishing the jury as to the limited use of the extrinsic offense evidence, cautioned that Merkt's previous conviction could be considered only in determining Merkt's state of mind or intent and "for no other purpose."

■ Merkt next asserts that admission of the extrinsic offense evidence as bearing upon her knowledge or intent is irrelevant because her sole defense in this case was misidentification. It is clear, however, that "Rule 404(b) evidence is particularly probative where the government has charged conspiracy." *United States v. Gordon,* 780 F.2d 1165, 1174 (5th Cir.1986).

> In the context of a conspiracy case, the mere entry of a not guilty plea sufficiently raises the issue of intent to justify the admissibility of extrinsic offense evidence.... Only when the defendant affirmatively takes the issue of intent out of the case is he entitled to an exclusion of the evidence.

*Id.* See *United States v. Roberts,* 619 F.2d 379, 383 (5th Cir.1980). Here, Merkt did nothing from which this court could conclude that she affirmatively took the issue of intent out of her case. *See, e.g., Id.* at 383 n. 2 ("a defendant who intends to assert a defense based upon mistaken identity may make an appropriate stipulation to avoid the introduction of extrinsic offense evidence").

Merkt also contends that a remand is mandatory because the district court allowed the admission of the extrinsic offense evidence without a prior on-the-record determination that the probative value of the evidence outweighed its prejudicial effect. In *United States v. Robinson,* 700 F.2d 205 (5th Cir.1983), cert. denied, 465 U.S. 1008, 104 S.Ct. 1003, 79 L.Ed.2d 235 (1984), this court held that:

> [I]n Rule 404(b) cases an on-the-record articulation by the trial court of *Beechum's* probative value/prejudice inquiry [is warranted] *when requested by a party.* In the absence of on-the-record findings *in response to such a request,* we will be obliged to remand unless the factors upon which the probative value/prejudice evaluation were made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling.

*Id.* at 213 (emphasis added; footnote omitted).

*Robinson's* requirement of a prior on-the-record articulation of the probative value/prejudice analysis is only triggered by the request of a party. Here, defense counsel made no specific request for an on-the-record probative value/prejudice determination. Because the district court subsequently made the probative value/prejudice evaluation,[14] this contention, like the others, fails to persuade. Cf. *United States v. Lavelle,* 751 F.2d 1266, 1279 (D.C.Cir.) ("no reversal or remand is warranted unless the trial court refuses to make an on-the-record determination *in response to such a request "*), cert. denied, — U.S. ——, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985) (emphasis in original).[15]

---

**13.** The extrinsic offense evidence must also meet the other requirements of Fed.R.Evid. 403, which provides that, although relevant, extrinsic offense evidence may be excluded if it will confuse the issues, mislead the jury, or cause undue delay, waste of time, or needless presentation of cumulative evidence.

**14.** Further, although the appellants do not specifically challenge the district court's post-trial findings, we find that the extrinsic evidence was relevant to Merkt's knowledge or intent and that the substantive value of the extrinsic evidence outweighed its possible prejudicial effect.

**15.** The admission of the extrinsic offense evidence prior to court approval was in violation of court order. However, the government actions did not rise to the level of prosecutorial misconduct. It appears from the record that the initial injection of the prior conviction information was inadvertent. The evidence was

## VI.

### REFUGEE STATUS

Section 1324 makes it unlawful for a person to assist an alien who is "not lawfully entitled to enter or reside within the United States." 8 U.S.C. § 1324(a). The appellants assert that El Salvadorans, as nationals of a country torn by internal conflict, are "refugees" entitled to sanctuary in the United States and, thus, are not "illegally" within its borders. Since the aliens' status is an element of the crime charged, the appellants assert that whether the aliens are refugees entitled to remain in the United States is a question of fact which should have been submitted to the jury.

■ Appellants first contend that the aliens are entitled to "reside" in the United States pursuant to the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102. This inventive argument was previously rejected by this court in *United States v. Pereira-Pineda*, 721 F.2d 137, 139 (5th Cir.1983). We are bound by our own precedent.

■ Appellants also assert that the United States' accession to the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967 [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, creates for all "refugees" an "entitlement" to "reside" in the United States. Even though the Protocol bound the signatories to comply with the substantive provisions of Articles 2 through 34 of the United Nations Conven-

tion Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951), the Supreme Court has held that accession to the Protocol did not create new rights or substantially alter existing domestic immigration and refugee law. *See I.N.S. v. Stevic*, 467 U.S. 407, 417–18, 428–29 n. 22, 104 S.Ct. 2489, 2494–95, 2500 n. 22, 81 L.Ed.2d 321, 330–32, 336–37 n. 22 (1984). *See also Bertrand v. Sava*, 684 F.2d 204, 218 (2d Cir.1982); *Pierre v. United States*, 547 F.2d 1281, 1288–89 (5th Cir.), *vacated and remanded for consideration of mootness*, 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977). Thus, even if the aliens are refugees, the Protocol does not permit them to "reside" here contrary to domestic law or for purposes of 8 U.S.C. § 1324(a).[16]

## VII.

### JURY INSTRUCTIONS

■ To establish a violation of 8 U.S.C. § 1324(a)(2), the government must prove, *inter alia*, that the defendants acted willfully in furtherance of the aliens' violation of the law. See *Merkt*, 764 F.2d at 270. Although the appellants challenge the district court's refusal to give their proffered instruction on the "furtherance" element of the offense,[17] we find no reversible error in this instruction.

In *Merkt*, this court, for the first time, directly examined the requirement under § 1324(a)(2) that the defendant act willfully in furtherance of the aliens' violation of law. 764 F.2d at 271. This court held that:

---

properly admitted under Fed.R.Evid. 404(b) and, thus, the appellants can show no prejudice. Further, the jury was carefully instructed on the limited purpose for which the evidence could be considered. While we in no way condone the government's misstep, the appellants suffered no harm and the prosecutor was properly reprimanded by the trial court.

16. Amici urge this court to provide sanctuary, and thus legal status, to the aliens based on "custom" under international law. In enacting our refugee statute, however, Congress was not bound by international law, much less a purported "custom" of international law. *See, e.g., United States v. Quemener*, 789 F.2d 145, 156 (2d Cir.1986); *United States v. Allen*, 760 F.2d 447, 454 (2d Cir.1985); *United States v. Pinto-Mejia*,

720 F.2d 248, 259 (2d Cir.1983), *modified on other grounds*, 728 F.2d 142 (1984).

17. The appellants submitted the following instruction on "furtherance":

The phrase "in furtherance of such violation" means that the conduct involved was done with the specific intent of furthering the individual's ability to remain in the United States in violation of law. It is not enough that the transportation was incidental to, or merely permitted the person to maintain his or her illegal presence here. In order to constitute "furtherance" in violation of 8 U.S.C. 1324(a)(2), the transportation must be directly and substantially related to the individual's ability to avoid detection.

For the government to show that Merkt transported the aliens willfully "in furtherance of [their] violation of law," as the statute requires, it must show "a direct and substantial relationship between that transportation and its furtherance of the alien's presence in the United States." Willful transportation of illegal aliens is not, per se, a violation of the statute, for the law proscribes such conduct only when it is in furtherance of the alien's unlawful presence. The jury must be instructed that proof of this element of the offense is prerequisite to conviction.

*Id.* at 271–72 (footnote omitted). Here, the court instructed the jury that, in order to find the appellants guilty, it must find

that the transportation of the alien was done willfully in furtherance of the alien's violation of law; that is, to further the alien's illegal presence in the United States. Just incidental transporting [of] an illegal alien will not make you guilty of that offense. It has to be something that furthers that person's illegal presence in the United States.

 The court's instruction substantially covers the instruction requested by the appellants and, in substance, embodies the principles expressed in *Merkt.* While the court's instruction in this case does not use the words "direct and substantial relationship," the court's instruction makes clear that mere or incidental transportation of an alien is not sufficient to sustain a conviction under § 1324(a)(2). The court instructed that the jury must find that the transportation of the aliens was done willfully and in furtherance of the aliens' illegal presence in the United States. When viewed as a whole, this instruction satisfies the test in *Merkt.* We find the appellants' remaining challenges to the jury instructions to be without merit.[18]

18. The appellants' assertion that they were entitled to a good faith belief instruction is, in essence, a mistake of law defense which was foreclosed by this court in *Merkt,* 764 F.2d at 273. *But see Merkt,* 764 F.2d at 275 (Rubin, J., dissenting). The appellants' assertion that they

## VIII.

## SUFFICIENCY OF THE EVIDENCE

 The appellants assert that the evidence was insufficient to sustain their convictions. Having reviewed all the evidence and the inferences which may be drawn therefrom in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942), we must conclude that it was sufficient to sustain the convictions of both Elder and Merkt.

AFFIRMED.

were entitled to a religious defense instruction has been foreclosed by our holding that they had no religious defense. Finally, the court's charge on conspiracy was adequate. *See United States v. Martin,* 790 F.2d 1215, 1219 (5th Cir. 1986).