**AMERICAN BAPTIST CHURCHES IN THE U.S.A., et al., Plaintiffs,**

v.

**Edwin MEESE III, in his official capacity as Attorney General of the United States, and Alan Nelson, in his official capacity as Commissioner of the Immigration and Naturalization Service, Defendants.**

**No. C–85–3255 RFP.**

United States District Court, N.D. California.

March 24, 1989.

Morton Stavis, Frank E. Deale, Center for Constitutional Rights, New York City, Ellen Yaroshefsky, New York City, Marc Van Der Hout, Nat. Lawyers Guild, Ephraim Margolin, Sandra Coliver, James J. Garrett and Monique Van Yzerlooy, Morrison & Foerster, San Francisco, Cal., for plaintiffs.

Joseph P. Russoniello, U.S. Atty., and Andrew M. Wolfe, Asst. U.S. Atty., San Francisco, Cal., for defendants.

## AMENDED MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

PECKHAM, District Judge.

### INTRODUCTION

Defendants move for summary judgment on plaintiffs' claim under the Free Exercise clause of the first amendment, dismissal or a stay of plaintiffs' selective enforcement claim, dismissal of the claims of the plaintiff refugee organizations due to lack of associational standing, dismissal of the

claims of individual plaintiffs Doe and Perez for failure to exhaust administrative remedies, and dismissal of the international law, equal protection and tort claims due to legal insufficiency.

Plaintiffs move to compel the production of documents and to reconsider the stay of the Kisor deposition.

## BACKGROUND

Two distinct groups of plaintiffs bring this action, each asserting independent causes of action. The first group of plaintiffs is composed of various religious organizations. These organizations, which sue on their own behalf, allege that, "as a matter of religious faith and practice, [they] have determined to offer sanctuary to persons from El Salvador and Guatemala." First Amended Complaint ("FAC") ¶ 1. They contend that the defendants' prosecutions of religious sanctuary workers under 8 U.S.C. section 1324(a), the criminal harboring and transporting statute, interferes unconstitutionally with their first amendment right to freely exercise their religion. They also claim that these prosecutions constitute religious harassment proscribed by the first amendment. They seek preliminary and permanent injunctions barring defendants from continuing or commencing any prosecutions of persons affiliated with the religious movement of sanctuary, as well as a declaratory judgment that such individuals are entitled to provide assistance to aliens in this country who are seeking refuge from El Salvador and Guatemala. Plaintiffs limit their request for an exemption to those acts committed before November 6, 1986, the date that Congress amended the criminal harboring and transporting statute. *See* Immigration Reform and Control Act of 1986, S.Res. 1200, 99th Cong., 2d Sess. § 112, U.S.Code Cong. & Admin.News 1986 pp. 5649, 5716.

The second group of plaintiffs includes three Central American Refugee service organizations, which sue on behalf of their members, and two individual undocumented aliens, who sue on their own behalf. These plaintiffs contend that international treaties and customary international law confer upon Salvadoran and Guatemalan refugees the rights to temporary refuge in this country. They also argue that the defendants' discriminatory application of immigration laws violates the fifth amendment right of persons from El Salvador and Guatemala to the equal protection of the laws. Finally, they present a claim sounding in tort, alleging that defendants have recklessly endangered the lives of refugees by knowingly and willfully sending them to countries where they are subject to wrongful death, assault, battery and intentional infliction of emotional harm. The refugee organizations seek preliminary and injunctive relief "barring the defendants from arresting and deporting Salvadorans and Guatemalans to those countries until such time as war, persecution and the commission of human rights violations in those countries have ceased," as well as "a declaratory judgment that persons fleeing war, persecution and widespread human rights violations in Guatemala and El Salvador are entitled to temporary refuge within the United States until such time as those conditions no longer exist in those countries." FAC ¶ D.

Defendants have once before moved to dismiss. By order dated March 30, 1987, we denied this motion with respect to the plaintiff religious organizations' first amendment claim. *American Baptist Churches in the U.S.A. v. Meese,* 666 F.Supp. 1358, 1364–66 (N.D.Cal.1987). We also found that the plaintiff religious organizations lacked standing to assert the rights of Salvadorans and Guatemalans to temporary refuge, but granted leave to amend the complaint to establish associational standing. *Id.* at 1366–69.

Defendants now move for summary judgment as to plaintiffs' free exercise claim, or in the alternative, for a stay. Defendants also move to dismiss plaintiffs' religious harassment claim due to legal insufficiency. In addition, defendants move to dismiss the refugee organizations' claims for want of associational standing, for failure to exhaust administrative remedies, and for legal insufficiency. Finally,

760

defendants move to dismiss the claims of the individual refugees for failure to exhaust administrative remedies and for legal insufficiency.

The court has stayed the Kisor deposition pending the disposition of these motions. Plaintiffs request that this stay be lifted and move to compel the production of documents.

## DISCUSSION

### I. PLAINTIFF RELIGIOUS ORGANIZATIONS' FIRST AMENDMENT CLAIMS

#### A. Free Exercise Claim

In its March 27, 1987 order, this court applied a three-prong test for evaluating facially neutral laws that incidentally restrict the free exercise of religious belief. Under this test, courts weigh the following factors:

(1) the magnitude of the statute's impact upon the exercise of the religious belief,

(2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief, and

(3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

*E.E.O.C. v. Pacific Press Publishing Ass'n*, 676 F.2d 1272, 1279 (9th Cir.1982) (quoting *E.E.O.C. v. Mississippi College*, 626 F.2d 477, 488 (5th Cir.1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981)); *see also Callahan v. Woods*, 736 F.2d 1269, 1273 (9th Cir.1984). The court concluded that criminal prosecutions under 8 U.S.C. section 1324 bear a close "proximity and necessity" (*Callahan v. Woods, supra*, 736 F.2d at 1274) to a compelling state interest: congressional control of the borders. Nevertheless, the court denied defendants' motion to dismiss, holding that issues of fact remained with respect to the first and third prongs of the *Pacific Press* test.

In moving for summary judgment, defendants do not challenge (and therefore tacit-ly admit) the court's prior finding that enforcement of section 1324 has a substantial impact upon the plaintiffs' exercise of their religious beliefs. Thus, for purposes of this motion the court assumes that the plaintiffs have satisfied the first prong of the *Pacific Press* test.

The court thus turns to the third factor set forth in *Pacific Press:* the extent to which granting an exemption to plaintiffs would impede the government's concededly compelling aims. This "'least drastic means' inquiry ... is the critical aspect of free exercise analysis." *Callahan, supra*, 736 F.2d at 1272. "The state must show that uniform application of its rule is the least drastic means available for the regulation's enforcement." *Paul v. Watchtower Bible & Tract Society of New York, Inc.*, 819 F.2d 875, 882 n. 6 (9th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987). For example, in *United States v. Thirty Eight (38) Golden Eagles*, 649 F.Supp. 269, 277–78 (D.Nev.1986), *aff'd*, 829 F.2d 41 (9th Cir.1987) a forfeiture action under the Bald Eagle Protection Act, the court imposed civil penalties on a Native American who used eagle parts in religious ceremonies because exempting Native Americans from the Act's regulations would have threatened the eagle population. *But see United States v. Abeyta*, 632 F.Supp. 1301 (D.N.M.1986) (criminal prosecution of Native American under Bald Eagle Protection Act subject to free exercise challenge because less burdensome enforcement of Act was possible; district court in Tenth Circuit did not employ Ninth Circuit's *Callahan* test for free exercise claims; approach rejected by *38 Golden Eagles* court). Similarly, the Ninth Circuit in *Graham v. Commissioner of Internal Revenue*, 822 F.2d 844 (9th Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988), rebuffed a free exercise challenge by Scientologists to an IRS decision to disallow certain tax deductions. The court found that the "government's interest in a neutral and enforceable taxation system is compelling," *id.* at 853, and that the cost of granting an exemption would be too great. *Id.*

Defendants argue that granting plaintiffs with a religious exemption to prosecution under section 1324 would dramatically impair the government's ability to effectively regulate its borders. Defendants contend that any such exemption would necessarily extend to the entire membership of the four religious denominations who are parties to this action, totalling over 14.0 million individuals. Even if but a few of these organizations' members are currently involved in the sanctuary movement, defendants argue, enjoining further prosecutions will likely result in much greater participation.

■ Plaintiffs meet defendants' argument by limiting their request for a religious exemption to prosecutions for activity engaged in on or before November 6, 1986, the date Congress amended the criminal harboring and transporting statute. *See* Immigration Reform and Control Act of 1986, S.Res. 1200, 99th Cong., 2d Sess. § 112, U.S.Code Cong. & Admin.News 1986 pp. 5649, 5716.[1] Although the First Amended Complaint ("FAC") traces the language of the old version of the statute, *see* FAC ¶ 41C, it elsewhere seems to attack Immigration and Naturalization Service ("INS") prosecutions under either version, old or new. Plaintiffs' memoranda do make clear that plaintiffs seek to enjoin prosecutions under the old version only. Plaintiffs also made this clear at oral argument.

Construing the complaint to address prosecutions under the old version of the statute only, defendants have not shown that a religious exemption for past acts only will "open the floodgates" of sanctuary-based section 1324 violations and impede the statute's objectives. The defendants have elsewhere admitted that the sanctuary movement involves refugees from but a few countries and only a few thousand workers. Thus, an issue of fact remains, and the government's proffered statistics relating to world-wide numbers of refugees and to the millions of members of these denominations do not settle the matter.

■ Defendants note in passing that construing the FAC to challenge prosecutions under only the old version of section 1324 raises substantial questions regarding plaintiffs' standing. Plaintiffs seek prospective relief; their "damage" consists of the deterrent effect that prosecutions have had on potential sanctuary workers. In order to establish standing under Article III of the Constitution, a plaintiff must demonstrate, *inter alia*, that a substantial likelihood exists that the relief requested will prevent the feared injury to the plaintiff. *See Olagues v. Russoniello*, 797 F.2d 1511, 1517 n. 7 (9th Cir.1986), *vacated as moot on other grounds*, —— U.S. ——, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987). Here, however, even if the court grants the relief sought by plaintiffs and grants an injunction against prosecutions under old section 1324 the plaintiff organizations' members will still be deterred from participating in sanctuary because the current and future threat is prosecution under the new version of 1324, not the old one.

---

1. Plaintiffs do not seek to enjoin prosecutions for activities engaged in after that date because they acknowledge that enforcement efforts may shift away from sanctuary workers under the amended law. They state:

 Section 112 of the IRCA, entitled "Unlawful Transportation of Aliens to the United States", amends the former provisions of the Immigration and Nationality Act § 274(A) under which religious sanctuaries have been and will continue to be prosecuted for acts which the government claims constitute smuggling, harboring, transporting, or encouraging and inducing the entry of illegal aliens.... The language of the new subsection has the potential to bring about substantial changes in agency interpretation and implementation of these prohibitions.... It is possible, if not likely, that enforcement of the criminal statute will be directed toward employers and that sanctuaries will not be targeted under the new law as they have been and continue to be under the prior law.

 Since there have been no prosecutions under the new law and because it is a long accepted principle that the executive is presumed to act in accordance with the law, plaintiffs must presume that the defendants will act in accordance with applicable domestic and international law when interpreting the statute.

 Plaintiffs' Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss, at 4–5.

Plaintiffs respond by claiming that (1) sanctuary workers remain subject to prosecution for activities engaged in prior to November 6, 1986, and (2) "present acts of sanctuary could be prosecuted for many years to come as conspiracy to violate the old version of 8 U.S.C. § 1324." Plaintiffs' Sur Reply at 4. These claims fail to respond to the questions of standing raised once the claim for relief is limited to prosecutions under the old version of section 1324. In our prior order, we found that the plaintiff religious organizations lacked associational standing to assert the first amendment claims of their members. *American Baptist Churches in the U.S.A. v. Meese,* 666 F.Supp. 1358, 1364 (N.D.Cal. 1987). We granted plaintiffs standing to assert these claims on their own behalf, however. In so holding, we found that "[plaintiffs] have alleged that the threat of prosecutions has a deterrent effect upon persons who would otherwise be willing to participate in the sanctuary movement. *Of course, if the plaintiff religious organizations are unable to prove the existence of such a deterrent effect at trial, the court will be compelled to conclude that they lack standing to assert their claims." Id.* (emphasis added). Thus, we expressly conditioned plaintiffs' standing on the deterrent effects of prosecution. By limiting their request for exemption to prosecutions under the old version of section 1324, plaintiffs have eliminated any conceivable deterrent effect on "persons who would otherwise be willing to participate in the sanctuary movement." There is thus no "'substantial likelihood' that the relief requested will redress or prevent the injury." *McMichael v. County of Napa,* 709 F.2d 1268, 1269–70 (9th Cir.1983) (citations omitted). Accordingly, plaintiffs lack standing to assert their first amendment claims.

### B. Religious Harassment Claim

Plaintiffs allege that defendants have prosecuted sanctuary workers "in bad faith for the sole purpose of harassing members and employees of religious groups who are participating in the sanctuary movement." Complaint ¶ 52. Defendants invite the court to construe this allegation as charging defendants with selective enforcement of section 1324 in violation of the equal protection component of the fifth amendment. Defendants' Memorandum in Support of Motion for Summary Judgment at 10. *See Wayte v. United States,* 470 U.S. 598, 608–09, 105 S.Ct. 1524, 1531–32, 84 L.Ed.2d 547 (1985). In order to prevail in an allegation of selective enforcement, plaintiffs bear the burden of presenting a *prima facie* case showing *both* (1) "that others similarly situated generally have not been prosecuted for conduct similar to that for which [they were] prosecuted," and (2) "that [their] selection was based on an impermissible ground such as race, religion or [their] exercise of [their] first amendment right to free speech." *United States v. Scott,* 521 F.2d 1188, 1195 (9th Cir.1975) (citations omitted), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976); *see also United States v. Ness,* 652 F.2d 890, 892 (9th Cir.1981), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981); *United States v. Wilson,* 639 F.2d 500, 503 (9th Cir.1981). The court may dismiss a claim of selective enforcement without evidentiary hearing if the party asserting the claim is unable to create a "reasonable doubt" about the propriety of the prosecutor's purpose. *United States v. Saade,* 652 F.2d 1126, 1135–36 (1st Cir.1981) (upholding trial court's decision to deny without evidentiary hearing defendant's motion to dismiss information on basis of selective enforcement); *see also Attorney General of the United States v. Irish People, Inc.,* 684 F.2d 928, 932 (D.C. Cir.1982), *cert. denied,* 459 U.S. 1172, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983); *United States v. Berrios,* 501 F.2d 1207, 1211–12 (2d Cir.1974) ("decision to permit a hearing ... lies largely in the trial judge's discretion"). "The fact that access to the Government's files might be helpful to a defendant seeking to prove discriminatory prosecution does not relieve him of the burden of making an initial showing, nor does that fact, in itself, entitle every defendant raising such a claim to discovery." *Ness, supra,* 652 F.2d at 892 (footnote omitted).

Although the plaintiffs have presented ample evidence to call into question the propriety of the defendant's motives in prosecuting sanctuary workers, they have failed adequately to establish the first element of the *prima facie* case, that others are generally not prosecuted for the same conduct. Plaintiffs complain of five prosecutions brought against sanctuary defendants since 1984. During the years 1984 through 1986, however, the United States brought 5,875 prosecutions resulting in 4,021 convictions under section 1324. Even granting the existence of adequate evidence of impermissible prosecutorial motive to raise a question of fact, plaintiffs have provided no evidence of discriminatory effect. They have thus failed to satisfy the first prong of the *prima facie* showing for selective enforcement. Absent such a showing, plaintiffs are not entitled to search the government's files in order to substantiate their selective prosecution claim. *Ness, supra,* 652 F.2d at 892.

The sole effort that the plaintiffs have made to show discriminatory effect is to allege that the government does not enforce section 1324 against "owners and managers of agricultural companies." First Amended Complaint ¶ 42E. Even if true, such an allegation does not suffice to satisfy the first prong of the *prima facie* test for selective prosecution. The plaintiffs simply allege that a discrete subclass of potential criminal defendants (here, agricultural owners and managers) have not been prosecuted. The plaintiffs strike an irrelevant contrast, however. The correct comparison is between plaintiffs and potential defendants *generally. See, e.g., United States v. Wilson,* 639 F.2d 500, 504 (9th Cir.1981); *United States v. Scott,* 521 F.2d 1188, 1195 (9th Cir.1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976). Thus, the question is whether the

government has singled out sanctuary members for prosecution while disregarding other violators of section 1324. As the above figures show, the government has not. Accordingly, to the extent that the plaintiffs' complaint states a cause of action for selective prosecution, the defendants' motion for summary judgment should be granted.

The plaintiffs respond that their action for religious harassment arises directly under the first amendment, citing *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985), rather than under the equal protection component of the fifth amendment. The plaintiffs claim that they have been prosecuted under section 1324 because their sanctuary activities are regarded as politically damaging, and not because these activities pose a threat to border security. This motive, plaintiffs argue, is impermissible.

In *Wayte,* the petitioner sought to strike down his indictment pursuant to the Justice Department's "passive enforcement" policy, under which the government prosecuted only those who reported themselves as having violated the registration requirements of the Selective Service System. The petitioner challenged the policy directly on First Amendment grounds, arguing that it created a content-based regulation " 'with a concomitantly disparate, content-based impact on nonregistrants.' " *Id.* at 611, 105 S.Ct. at 1532. (quoting Brief for Petitioner at 23) (footnote omitted).[2] The Court rejected this argument, concluding that the enforcement policy survived the test set forth in *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968), because it was narrowly tailored to a compelling state interest and thus justified any incidental limitations on First Amendment freedoms.[3] The Court further noted that accepting petitioner's argument would permit any criminal to obtain immu-

**2.** The petitioner also challenged his indictment on selective prosecution grounds. The Supreme Court rejected this argument because the petitioner failed to show "that the government prosecuted him *because of* his protest activities." *Wayte,* 470 U.S. at 610, 105 S.Ct. at 1532.

**3.** Under the *O'Brien* test, government regulation which incidentally limits first amendment freedoms is justified.

"if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."
391 U.S. at 377, 88 S.Ct. at 1679.

nity from prosecution simply by reporting himself or herself to the authorities and then claiming to do so as a means of protesting the underlying law. *Wayte,* 470 U.S. at 614, 105 S.Ct. at 1534.

The Supreme Court in both *O'Brien* and *Wayte* confronted government regulation of conduct with a speech component: the public flouting of the Selective Service laws. Here the court confronts government regulation of religiously motivated conduct: the violation of section 1324. Of course, both speech and religious expression are entitled to protection under the First Amendment. The question is whether the test formulated in *O'Brien* ought to be applied to conduct that is essentially *religious* in character, rather than symbolic speech.

Here, the plaintiffs are not being prosecuted for vocally opposing official policy in Central America. Rather, they are being prosecuted for harboring illegal aliens. There is no incidental regulation of speech attending prosecution under this law. Were sanctuary workers to cease harboring aliens, the prosecutions would stop. Nothing would prevent them from vocally opposing administration policy, just as they have in the past. The *O'Brien* and *Wayte* tests are designed to afford First Amendment protection to conduct intended to convey thoughts and ideas. The plaintiffs by flouting section 1324 do not seek to exercise their right of free speech by symbolically challenging administration policy. Instead, they act upon their religious convictions and offer refuge to those persecuted elsewhere. In citing *Wayte,* the plaintiffs invoke the standard of First Amendment protection applicable to symbolic conduct, and ask the court to apply it to that which is not symbolic conduct. The plaintiffs cite no other courts which have taken this course, and we decline to do so.

## II. CLAIMS OF REFUGEE ORGANIZATIONS AND INDIVIDUAL REFUGEES

### A. Associational Standing of Refugee Organizations

Our prior order denied plaintiff refugee organizations associational standing to as-

sert the rights of their members. 666 F.Supp. at 1369. We invited plaintiffs to file an amended complaint to state facts sufficient to confer associational standing. *Id.* Plaintiffs filed their amended complaint on April 29, 1987, and defendants now move to dismiss.

The Supreme Court has held that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

■ To establish associational standing, plaintiffs must first show that the members of the refugee organizations have standing to sue on their own behalf. Under the circumstances of this case, plaintiffs must show that these members have appropriate immigration status and that they have exhausted their administrative remedies. Plaintiffs' amended complaint states that the refugee organizations' members include persons who are entitled to refugee status under 8 U.S.C. section 1101(a)(42), which grants such status to those suffering "persecution or a well-founded fear of persecution." Some of these so-called "statutory refugees" have allegedly applied for asylum and been denied; many have not. Other members do not qualify for refugee status because they are unable to show the individualized persecution required by section 1101(a)(42); nevertheless, they seek temporary refuge under international law principles. Still others are at various stages of INS processing. *See* First Amended Complaint at 26:17–31:3. Taken together, plaintiffs have clearly shown that the refugee organizations represent not Salvadorans and Guatemalans generally, but persons with a specific and concrete stake in defendants' im-

plementation and enforcement of the immigration laws.

Plaintiffs concede that many of the members of the refugee organizations have not exhausted their administrative remedies, however. At least with respect to those who have applied refugee status and been denied, there are no procedures to exhaust. *See* 8 C.F.R. § 108.2 ("no appeal shall lie" from determination of district director to deny asylum). As for the many members who have not applied for refugee status, plaintiffs argue convincingly that the remedy afforded by exhaustion—individual determinations of eligibility for asylum—would not provide the relief sought here. Indeed, other courts have recognized that where agency action is challenged as unlawful and plaintiffs seek declaratory and injunctive relief, it makes little sense to require that individual plaintiffs exhaust their administrative remedies. *See, e.g., Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1033–35 (5th Cir.1982); *Orantes–Hernandez v. Smith*, 541 F.Supp. 351, 365 n. 14 (C.D.Calif.1982), *modified*, 685 F.Supp. 1488 (C.D.Cal.1988).

Finally, we note that courts often dispense with exhaustion requirements where pursuit of administrative remedies would be futile. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976) (exhaustion unnecessary because it is "unrealistic" to expect administrator to revamp agency procedures based upon a single claim alleging that those procedures were unconstitutional); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 641 n. 8, 95 S.Ct. 1225, 1230 n. 8, 43 L.Ed. 2d 514 (1975). *But see Dhangu v. Immigration and Naturalization Serv.*, 812 F.2d 455, 460 (9th Cir.1987) (petition for review denied because procedural defects in INS proceeding could be corrected via exhaustion of administrative remedies). Here, plaintiffs argue that the approval rates of applications for political asylum— under three percent for Salvadorans and under one percent for Guatemalans—render the pursuit of administrative remedies futile. Moreover, plaintiffs claim that applying for asylum exposes the applicant to increased risks of persecution if the petition is denied and the applicant deported. The court therefore concludes that plaintiffs have made an adequate showing to satisfy the first prong of the *Hunt* test for associational standing.

Under the second prong of the *Hunt* test, plaintiffs must show that the interests the organization seeks to protect are germane to its purpose. Defendants have not challenged this factor; indeed, the refugee organizations exist to further precisely those interests that are at issue here. *See Olagues v. Russoniello*, 770 F.2d 791, 799 (9th Cir.1985).

Finally, defendants argue that plaintiffs have failed to satisfy the third prong of the *Hunt* test; they assert that the claim "requires the participation of the individual members in the lawsuit." Defendants' Memorandum in Support of Motion to Dismiss at 16 (quoting *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441) The resolution of this issue turns on whether the claim asserted or the relief requested will require individualized proof; naturally, defendants assert that it will and plaintiffs insist that it will not.

Individualized proof as to the requested remedy is ordinarily required where damages are sought. *Warth v. Seldin*, 422 U.S. 490, 516, 95 S.Ct. 2197, 2214, 45 L.Ed. 2d 343 (1976). Where, as here, "the association seeks a declaration, injunction, or some other form of prospective relief it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Id.* at 515, 95 S.Ct. at 2213. Moreover, "equitable relief is particularly suited for group representation." *Olagues, supra*, 770 F.2d at 799.

Plaintiffs maintain that *Warth* and *Hunt* stand for the proposition that, where equitable relief is sought, group representation is always appropriate. This overstates the lesson of these decisions, however. The central inquiry is whether asserting the claim requires individual participation in establishing the proof. *Warth* and *Hunt* correctly note that, where injunctive relief is sought, individualized proof is ordi-

narily unnecessary. Thus, the Supreme Court denied an organization standing in *Warth* because the organization sought damages on behalf of its members, necessitating individualized proof as to the "fact and extent of injury" to the organization's individual members, 422 U.S. at 515–16, 95 S.Ct. at 2214, but granted the organization standing in *Hunt* because "neither the … claim nor the request for declaratory and injunctive relief requires individualized proof." 432 U.S. at 344, 97 S.Ct. at 2442. *See also Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *League of Women Voters v. Nassau County Bd. of Supervisors*, 737 F.2d 155 (2d Cir.1984), *cert. denied*, 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778 (1985).

The plaintiff refugee organizations herein assert a variety of claims that place in issue the motivation of undocumented Salvadorans and Guatemalans in entering this country. As a component of their claim, plaintiffs must prove that these aliens entered this country to escape persecution, rather than for illegitimate purposes such as seeking economic opportunities.[4] Because the participation of individual members is required, the plaintiff refugee organizations lack associational standing to pursue these claims on their members' behalf. Defendants' motion to dismiss on this ground is therefore granted.[5]

### B. Standing of Individual Refugees Doe and Perez

In the First Amended Complaint, the plaintiff refugee organizations have been joined by individual plaintiffs Doe and Perez. According to the complaint, Doe and Perez have fled to the United States to escape persecution in El Salvador and Guatemala respectively. Neither has applied for refugee status under 8 U.S.C. section 1101(a)(42), and neither has sought temporary refuge under international law principles. Defendants move to dismiss their complaint for failure to exhaust administrative remedies.

It is well settled that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938) (footnote omitted). The doctrine of exhaustion is intended to prevent premature judicial interference with the administrative process and to permit the agency ample opportunity to exercise its discretion or to utilize its expertise. *See McKart v. United States*, 395 U.S. 185, 193–94, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969). Exhaustion also affords the agency the opportunity to correct its own errors. *Sagermark v. Immigration and Naturalization Serv.*, 767 F.2d 645, 648 (9th Cir.1985), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986).

In the instant case plaintiffs concede that Doe and Perez have not exhausted their prescribed administrative remedies. They ask that this court dispense with this requirement because, given recent INS treatment of Salvadorans and Guatemalans, *see supra*, exhaustion would be futile. Moreover, they argue, exhaustion would work severe harm on Doe and Perez, for the likely result would be deportation, exposing both to the persecution they hope to flee. The quick response is that bald assertions of futility based upon the agency's lack of sympathy to these sorts of claims do not warrant circumventing the agency altogether. *See Dhangu v. Immigration and Naturalization Serv.*, 812 F.2d 455, 460 (9th Cir.1987). But plaintiffs have gone further by alleging the low

---

**4.** Defendants also assert that the individual participation of the organizations' members is required in order to show that these members have exhausted their administrative remedies. Assuming that this were so, the plaintiffs have clearly met this burden by providing sufficient facts to support their allegation that, for Guatemalans and Salvadorans, exhaustion of administrative remedies is futile.

**5.** By denying the refugee organizations associational standing to sue on behalf of their members, the court has not erected an insurmountable obstacle to the refugees' claims. Rather, we hold that the proper means of asserting these claims is through suit by individual refugees. Indeed, the complaint has already been amended to join individual plaintiffs Doe and Perez.

approval rates for such aliens and the persecution that awaits them in their native lands. They have thus provided a sufficient basis to conclude that exhaustion is futile and would inflict severe harm. Construing the facts most favorably to the non-movants, defendants' motion to dismiss is denied.

In addition, Doe and Perez seek declaratory and injunctive relief on behalf of all undocumented Salvadorans and Guatemalans. At best, exhaustion of administrative remedies could only result in the granting of refugee status; it would do nothing to obtain the equitable relief plaintiffs seek. In such circumstances, the court has discretion to dispense with the exhaustion requirement. *See Orantes–Hernandez v. Smith*, 541 F.Supp. 351, 365 n. 14 (C.D.Cal. 1982), *modified*, 685 F.Supp. 1488, 1503 (C.D.Cal.1988) (dispensing with exhaustion requirement when "some class members would never be able to raise the claims or secure redress"); *cf. Dhangu*, 812 F.2d at 460 (imposing exhaustion requirement because administrative review might provide the relief sought); *Bagues–Valles v. Immigration and Naturalization Serv.*, 779 F.2d 483, 484 (9th Cir.1985) (dispensing with exhaustion requirement where administrative review board lacked jurisdiction to hear plaintiff's constitutional claims). Accordingly, we deny defendants' motion to dismiss the claims of Doe and Perez for failure to exhaust administrative remedies.

### C. Merits of International Law Claims

#### 1. Introduction

Individual plaintiffs Doe and Perez claim that all Salvadoran and Guatemalan aliens in this country are entitled to a temporary haven in the United States until the internal armed conflict and human rights abuses in their homelands cease, or until they can be resettled in a third country. These organizations assert that the right to temporary refuge arises from two sources of international law: (1) Articles 1, 3 and 45 of the 1949 Geneva Convention Relative to the Protection of Civilian Persons in Time of War, August 12, 1949, 6 U.S.T. 3516, T.I. A.S. No. 3365 ("Geneva Convention IV"); and (2) customary international law. Before turning to these claims, a brief examination of domestic immigration law and its relationship to the concept of temporary refuge is appropriate.[6]

The Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (1980), was enacted by Congress in order to "bring United States law into conformity with our international treaty obligations." S.Rep. No. 256, 96th Cong., 1st Sess. 4, *reprinted in* 1980 U.S. Code Cong. & Ad.News 141, 144. The Act established uniform and nondiscriminatory standards for the admission of refugees into this country. Specifically, the Act "incorporated the internationally accepted definition of refugee contained in the U.N. Convention and Protocol Relating to the Status of Refugees." H.Conf.R. 781, 96th Cong., 2d Sess. 19, *reprinted in* 1980 U.S. Code Cong. & Ad.News 160. The term "refugee" was defined under the Act as any person who is "unable or unwilling" to return to his or her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Immigration and Nationality Act ("INA"), § 101(a)(2), (42)(A), 8 U.S.C. § 1101(a)(42)(A) (1982).

---

**6.** There is some confusion in the plaintiffs' brief over two different versions of the concept of temporary refuge. On the one hand, plaintiffs contend that *international law* confers upon Salvadorans and Guatemalans aliens the right to temporary refuge in this country until the internal armed conflict in their homelands ceases or they are resettled in a third country. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss at 25–26. At another point in their brief, however, the plaintiffs define the concept of temporary refuge as the right to presumptive refugee status until the defendants comply with this country's *domestic immigration laws. See id.* at 38–39. Thus, temporary refuge is defined both as an affirmative claim for relief under international law, and as a remedy for violations of domestic immigration law. Because the question before the court is simply whether the plaintiffs have stated a cognizable claim, we limit our discussion to the plaintiffs' affirmative claim for relief under international law.

Under the Refugee Act of 1980, an individual alien who has entered this country unlawfully may avoid deportation by applying for asylum or for the withholding of deportation. An alien who can prove a "well-founded fear of persecution" within the definition of section 101(a)(2), (42)(A) is entitled to a discretionary grant of asylum by the Attorney General of the United States. *See* INA § 208(a), 8 U.S.C. § 1158(a) (1982). The status of an alien granted asylum may be adjusted to that of permanent resident after one year of physical presence in the United States if the alien continues to meet the definition of "refugee" set forth in section 101(a)(2), (42)(A). *See* 8 C.F.R. § 209.2(a). Even if the Attorney General refuses to exercise his discretion to grant asylum, an alien may nonetheless be eligible for withholding of deportation under section 243(h) of the Act, which prohibits the deportation of an alien to any country where his "life or freedom would be threatened ... on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1) (1982). In order to qualify for withholding of deportation, an alien must demonstrate a "clear probability of persecution." *Immigration and Naturalization Serv. v. Stevic,* 467 U.S. 407, 430, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984). Unlike asylum, withholding of deportation does not afford the alien a right to remain in this country. Instead, it simply prohibits the Attorney General from deporting the alien to a particular country.

In order to qualify for either asylum or withholding of deportation, "general evidence of widespread conditions of violence affecting all residents of a country is not, by itself, sufficient." *Bolanos–Hernandez v. Immigration and Naturalization Serv.,* 749 F.2d 1316, 1323 (9th Cir.1984); *see also Cardoza–Fonseca v. Immigration and Naturalization Serv.,* 767 F.2d 1448, 1453 (9th Cir.1985) (holding that an applicant for asylum must show he or she would be "singled out for persecution"), *aff'd,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Although "general documentary evidence about oppressive conditions is rel-

evant," *Bolanos–Hernandez,* 749 F.2d at 1321 n. 12, such evidence must be accompanied by a showing that "the alien's predicament is appreciably different from the dangers faced by the alien's fellow citizens." *Vides–Vides v. Immigration and Naturalization Serv.,* 783 F.2d 1463, 1469 (9th Cir.1986). Thus, neither asylum nor withholding of deportation affords any right of temporary or permanent refuge in this country to broad categories of aliens based solely on their nationalities or general conditions of violence or persecution in their homelands.

In addition to the asylum and withholding of deportation provisions of the Refugee Act of 1980, undocumented aliens in this country may also escape deportation by being granted an extra-statutory form of relief known as extended voluntary departure ("EVD"). This relief is granted by the Attorney General in the exercise of his broad authority to enforce the nation's immigration laws. When the Attorney General grants EVD to aliens of a particular nationality, all deportations of those aliens are temporarily suspended. Individual aliens who are granted EVD need not establish any individualized threat of persecution and are automatically entitled to remain in this country for as long as the Attorney General deems appropriate. However, there are no codified standards for the exercise of the Attorney General's discretion to grant EVD, and the Attorney General has consistently refused to grant such relief to Salvadoran and Guatemalan aliens in this country.

Viewed against this backdrop of domestic immigration law, the temporary refuge claim asserted in this case is essentially a claim that Salvadorans and Guatemalans in this country are entitled under international treaties and customary international law to relief for which they have not qualified under the Refugee Act of 1980. *See United States v. Merkt,* 794 F.2d 950, 964 (5th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987); *United States v. Pereira–Pineda,* 721 F.2d 137, 139 (5th Cir.1983). The remedy sought here is in practical terms equivalent to ex-

tended voluntary departure. However, the plaintiffs seek to have this relief judicially imposed for the benefit of all Salvadorans and Guatemalans, whether or not they can demonstrate an individualized threat of persecution and whether or not the Attorney General decides to grant them EVD status. With this understanding of the legal context in which the plaintiffs' international law claims arise, we now turn to the merits of their contentions.

### 2. The Geneva Convention Relative to the Protection of Civilian Persons in Time of War

██ The plaintiffs here rely upon Articles 1, 3 and 45 of the Geneva Convention IV. Article 1 requires the signatory nations to "respect and ensure respect for the present convention[s] in all circumstances." Article 3 prescribes the protections that must be provided to civilians during non-international armed conflict. Article 45 forbids the forced repatriation of civilians to a country where humanitarian law violations are occurring during international armed conflict.[7] By their own terms, however, Articles 3 and 45 are inapplicable here. Article 3 restrains only the parties to non-international armed conflict, and Article 45 applies only to international armed conflict. Because the conflicts in El Salvador and Guatemala are not international conflicts, neither of these two provisions of the Convention is applicable in this case. Nonetheless, the plaintiffs argue that by deporting Salvadorans and Guatemalans to countries where Article 3 violations are occurring, the United States has failed to "respect and ensure respect" for the Convention within the meaning of Article I.

██ A duly enacted treaty must "be regarded in courts of justice as the equivalent to an act of the legislature." *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829) (Marshall, C.J.), *rev'd on other*

---

**7.** The Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949, provides:

ARTICLE 1

The High Contracting Parties undertake to respect and to ensure respect for the present Convention in all circumstances.

ARTICLE 3

In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:

(1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed *hors de combat* by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.

To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the abovementioned persons:

(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;

(b) taking hostages;

(c) outrages upon personal dignity, in particular humiliating and degrading treatment;

(d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

(2) The wounded and sick shall be collected and cared for.

. . . . .

The Parties to the conflict should further endeavour to bring into force, by means of special agreements, all or part of the other provisions of the present Convention.

. . . . .

ARTICLE 45

Protected persons may be transferred by the Detaining Power only to a Power which is a party to the present Convention and after the Detaining Power has satisfied itself of the willingness and ability of such transferee Power to apply the present Convention. If protected persons are transferred under such circumstances, responsibility for the application of the present Convention rests on the Power accepting them, while they are in its custody. Nevertheless, if that Power fails to carry out the provisions of the present Convention in any important respect, the Power by which the protected persons were transferred shall, upon being so notified by the Protecting Power, take effective measures to correct the situation or shall request the return of the protected persons. Such request must be complied with.

In no circumstances shall a protected person be transferred to a country where he or she may have reason to fear persecution for his or her political opinions or religious beliefs.

*grounds, United States v. Percheman,* 32 U.S. (7 Pet.) 51, 8 L.Ed. 604 (1833). The Supremacy Clause itself requires that the Constitution, laws of the United States and treaties "shall be the supreme Law of the Land." U.S. Const. art. VI, § 2. However, the Supreme Court has long recognized a distinction between treaty provisions that require implementing domestic legislation and those that confer rights by their own terms. *See, e.g., Foster v. Neilson,* 27 U.S. (2 Pet.) at 314. Although treaties that are not "self-executing" may be binding upon the United States as a matter of international law, *see* L. Tribe, *American Constitutional Law* 167 n. 3 (1978), "if not implemented by appropriate legislation they do not provide a basis for a private lawsuit...." *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 373 (7th Cir.1985).

In determining whether a treaty provision is self-executing, courts look to the following factors: (1) the language and purposes of the agreement as a whole; (2) the circumstances surrounding its execution; (3) the nature of the obligations imposed by the agreement; (4) the availability and feasibility of alternative enforcement mechanisms; and (5) the capability of the judiciary to resolve the dispute. *See Frolova,* 761 F.2d at 373 (citing cases). "[I]f the parties' intent is clear from the treaty's language courts will not inquire into the remaining factors." *Id.* (citing *Cardenas v. Smith,* 733 F.2d 909, 918 (D.C.Cir.1984)).

Applying these factors to the instant case, the court finds that Article 1 of the Geneva Convention is not a self-executing treaty provision. The language used does not impose any specific obligations on the signatory nations, nor does it provide any intelligible guidelines for judicial enforcement. As in *Frolova,* the treaty provision is "phrased in broad generalities," *id.* at 374, and contains no "rules by which private rights may be determined." *Dreyfus v. Von Finck,* 534 F.2d 24, 30 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976). Furthermore, judicial interference on the basis of such broadly articulated principles "might have serious foreign policy implications which courts are ill-equipped to anticipate or handle." *Frolova,* 761 F.2d at 375. Finally, the conclusion that Article 1 is not self-executing also comports with the results reached by numerous other courts in interpreting similar treaty provisions. *See, e.g., Immigration and Naturalization Serv. v. Stevic,* 467 U.S. 407, 428 n. 22, 104 S.Ct. 2489, 2500 n. 22, 81 L.Ed.2d 321 (1984) (holding that Article 34 of the 1967 Protocol is not self-executing because the language is merely "precatory"). Thus, the court concludes that the Geneva Convention IV does not provide any right of temporary refuge to Salvadorans or Guatemalans within this country.

### 3. Customary International Law

The plaintiffs' primary contention is that the deportation of aliens to El Salvador and Guatemala violates a principle of customary international law prohibiting the return of aliens to any country in which internal armed conflict is taking place. The "customs and usages of civilized nations" have long been used as a source of international law binding upon all nations "where there is no treaty, and no controlling executive or legislative or judicial decision...." *The Paquete Habana,* 175 U.S. 677, 702, 20 S.Ct. 290, 300, 44 L.Ed. 320 (1900). In recent years, principles of international customary law have been invoked with increasing frequency in the field of immigration law. *See, e.g., Rodriguez–Fernandez v. Wilkinson,* 505 F.Supp. 787, 795–800 (D.Kan.1980) (holding that indefinite detention of excludable alien violated customary international law), *aff'd,* 654 F.2d 1382, 1388 (10th Cir.1981). To date, however, no international or domestic court has decided whether the practice of granting temporary refuge to persons fleeing armed conflict has ripened into a norm of binding international law. *But see* Hartman & Perluss, *Temporary Refuge: Emergence of a Customary Norm,* 26 Va.J.Int'l L. 551 (1986) (arguing that temporary refuge is a binding principle of customary international law); Commentary, *Ecumenical, Municipal and Legal Challenges to United States Refugee Policy,* 21 Harv.C.R.–C.L. L.Rev. 493, 514–17 (1986) (same).

The Court of Appeals for the Fifth Circuit has recently indicated that, even if such a norm of customary international law exists, it could not provide a basis for relief in a domestic court. The Court reasoned that "[i]n enacting our refugee statute, ... Congress was not bound by international law." *United States v. Merkt*, 794 F.2d 950, 964 n. 16 (5th Cir.1986), *cert. denied*, 480 U.S. 946, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987). Thus, the court must confront a threshold question: to what extent has Congress supplanted principles of customary international law in the field of immigration law?

 The Supreme Court's early cases involving the concept of customary international law make clear that it applies only "in the absence of any treaty or other public act ... in relation to the matter." *The Paquete Habana*, 175 U.S. 677, 702, 20 S.Ct. 290, 300, 44 L.Ed. 320 (1900). Congress is not constitutionally bound to abide by precepts of international law, and may therefore promulgate valid legislation that conflicts with or preempts customary international law. *See* L. Henkin, *Foreign Affairs and the Constitution* (1972). Thus, even assuming that temporary refuge does qualify as a principle of customary international law, it will not be applied in a domestic court if Congress is found to have specifically rejected the asserted norm.

 In this case, Congress has specifically rejected the asserted norm of temporary refuge. Congress clearly intended that implementation of the new standards set forth in the statute would itself bring the United States into full compliance with its obligations under international law. *See* S.Rep. No. 256 at 4; *reprinted in* 1980 U.S.Code Cong. & Ad.News at 144. Yet, Congress did not include within the 1980 Act any reference to a right of temporary refuge for aliens fleeing general conditions of violence or internal armed conflict. We thus conclude that Congress rejected the norm of temporary refuge asserted here.

Plaintiffs contend that this result cannot be reconciled with the general principle that "an Act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains...." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) (Marshall, C.J.). Nevertheless, the only "possible construction" of the Refugee Act of 1980 is that it was intended to provide the exclusive means for obtaining refugee status in this country. Congress itself has on several occasions specifically rejected various proposals to provide for a right of temporary refuge in this country. *See, e.g.,* S. 377, 99th Cong., 1st Sess. (1985); H.R. 822, 99th Cong., 1st Sess. (1985). The most recent such proposal was made in connection with the passage of sweeping new revisions in the nation's immigration laws, when a House Conference Committee abandoned a provision that would have temporarily suspended the deportation of Salvadorans and Guatemalans. The committee stated:

> The Conferees believe that deportations should be suspended on a case-by-case basis in cases such as El Salvador where natural disasters have added to other societal problems in a manner which adds significantly to the difficulties inherent in the settlement of deportees. Nothing in this statement is intended to set a precedent for ignoring the basic standards set forth in the Refugee Act of 1980.

H.R.Rep. 99–1000, *reprinted in* 1986 U.S. Code Cong. & Ad.News 5840, 5854. This rejection of temporary refuge for Salvadorans and Guatemalans is dispositive of the plaintiffs' customary international law claim in this case.

In sum, we find that Congress has specifically rejected the norm of temporary refuge relied upon here. Accordingly, the motion to dismiss the temporary refugee claim is granted.

## D. Equal Protection Claims

In addition to claims resting upon international law, plaintiffs also assert that defendants' discriminatory application of immigration laws violates the fifth amendment right of persons from El Salvador and Guatemala to equal protection of the

laws. As stated more specifically in plaintiffs' complaint,

> Defendants engage in a practice of generally granting asylum, refugee status, extended voluntary departure or other relief providing refuge to persons who are fleeing unrest or disorder in countries they consider "communist" or dominated by the Soviet Union.... At the same time, persons fleeing El Salvador and Guatemala are denied the right to even temporary refuge in the United States because the governments of those countries are considered to be political allies of the United States. The political basis for these determinations has no justification in either the U.S. statutes or international law.

FAC ¶ 61–63. Although both parties treat the allegations concerning extended voluntary departure and those regarding asylum and the withholding of deportation identically, we believe different considerations may apply and analyze them separately.

### 1. Extended Voluntary Departure

Through their requested relief as well as directly in their pleadings, plaintiffs assert that defendants' denial of extended voluntary departure to Salvadorans and Guatemalans and approval of such status to refugees from "communist" countries constitutes a violation of the equal protection clause. In addition to advancing this claim in their third cause of action, plaintiffs seek an injunction preventing deportation of Salvadorans and Guatemalans until the threat of war and persecution subsides. Such an injunction would relieve Salvadorans and Guatemalans of the need to make an individualized showing of the threat of persecution as required in asylum and withholding of deportation proceedings. In this manner, plaintiffs would obtain the functional equivalent of extended voluntary departure: a determination that all aliens of a particular nationality are entitled to remain in the United States on a temporary basis. In both circumstances, the question thus becomes whether the Attorney General has, by granting EVD status to some but not to others alleged to be equally worthy, violated plaintiffs' right to equal protection.

■■■ At the outset, we note that although the executive branch possesses substantial discretion to make nationality-based distinctions among aliens, such decisions are subject to judicial review. In *Narenji v. Civiletti*, 617 F.2d 745 (D.C.Cir. 1979), *cert. denied*, 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980), for example, the D.C. Circuit reviewed a regulation promulgated by the Attorney General that imposed a reporting requirement on all non-immigrant alien post-secondary school students from Iran and provided that failure to comply was grounds for deportation. Noting the exigencies posed by the Iranian hostage crisis, the court found the regulation "supported by a rational basis" and thus constitutional. 617 F.2d at 748. Similarly, in *Hotel and Restaurant Employees Union, Local 25 v. Smith*, 594 F.Supp. 502 (D.D.C.1984), the district court determined that the Attorney General "acted rationally" in denying Salvadorans EVD status and thus did not violate their equal protection rights. 594 F.Supp. at 508.[8]

Although in this circuit no court has squarely confronted the issue, several appellate court decisions have implied that a governmental policy that makes nationality-based distinctions should at least be reviewed for equal protection violations. *Shahla v. Immigration and Naturalization Serv.*, 749 F.2d 561, 563 (9th Cir.1984); *Ghajar v. Immigration and Naturaliza-*

---

**8.** After further review and especially in light of the sharply divided *en banc* appellate court decision, we question whether we should rely heavily upon the district court's implicit conclusion that the Attorney General's denial of EVD should only be summarily reviewed, if at all. As Judge Mikva noted,

> Although decisions made by Congress or the President in the area of immigration are subject to a narrow standard of review, discretion is not without bounds. For example, if there were reason to believe that the Attorney General's denial of EVD status to individuals or a group was motivated by discriminatory racial or religious animus, this court could review such a policy for abuse of discretion.

846 F.2d at 1511 [citations omitted]. At this point, we note only that the court did subject the EVD decision to at least some review.

*tion Serv.*, 652 F.2d 1347, 1349 n. 1 (9th Cir.1981); *Yassini v. Crosland*, 618 F.2d 1356, 1362–63 n. 7 (9th Cir.1980). In these opinions, the Ninth Circuit touched upon the equal protection and due process claims of Iranian nationals affected by Executive Branch action taken in the wake of the Iranian hostage crisis. No plaintiff in those cases established that he or she was treated differently than other aliens because of his or her nationality. The courts implied, however, that an alien might be able to succeed with an equal protection argument if such differential treatment were proven. Further, we note that in this instance we are not faced with an explicit Presidential policy such as the response to the Iranian hostage crisis that might warrant insulating nationality-based determinations from judicial review.

Due in all likelihood to their concentration on the other claims in this case, defendants make no effort to demonstrate that their actions withstand even the most minimal scrutiny. Similarly, plaintiffs do not specifically contend that the governments' actions are wholly irrational. The parties' submissions thus fail to address the rationale for defendants' determinations and whether such purpose violates the equal protection clause. For example, even though plaintiffs allege that the defendants have based their EVD decisions upon the political nature of the regime from which the aliens came, they have not specified whether such treatment stems from foreign policy considerations or discriminatory motives.[9] In resolving these questions, we must first address the degree of scrutiny that we should give the attorney general's decision. In particular, we must determine whether the defendants' denial of EVD to Salvadorans and Guatemalans stems from a "discriminatory animus" that would warrant closer scrutiny than traditional rational relationship review. We will await further guidance from the parties before determining the legal and factual validity of this claim. Accordingly, the defendants' motion to dismiss is denied.

### 2. Asylum and Withholding of Deportation

The plaintiffs also assert that the defendants' allegedly discriminatory treatment of Salvadorans and Guatemalans in asylum and withholding of deportation proceedings violates the equal protection clause. The plaintiffs seek an order "requir[ing] defendants to propose a plan for the orderly, non-discriminatory and procedurally fair reprocessing of all denied political asylum applications of Salvadorans and Guatemalans filed subsequent to 1980." FAC at 79. In addition to the grounds discussed with regard to EVD, we note a further reason to deny defendants' motion for this claim.

Here, Congress has promulgated standards that, if satisfied, entitle the alien to enter the United States.[10] Plaintiffs charge that the defendants have discriminated against Salvadorans and Guatemalans in applying these standards. As a general rule, such nationality-based distinctions may be permissible. Because the statutory standards are wholly neutral, however, it is far from certain that the Attorney General can consider the applicant's nationality in determining his or her

---

**9.** We emphasize that in passing on the rationality of the defendants' acts we are hesitant to second-guess the considered decisions of the politically accountable branches in the realm of immigration at least to the extent they stem from foreign policy considerations. *See, Regan v. Wald,* 468 U.S. 222, 242, 104 S.Ct. 3026, 3038, 82 L.Ed.2d 171 (1984) ("Matters relating 'to the conduct of foreign relations ... are so exclusively entrusted to the political branches of inquiry as to be largely immune from judicial inquiry or interference.'"). If immigration policy determinations stemmed from discriminatory motives, however, we expect that we would subject such determinations to closer scrutiny. At this stage, there is insufficient basis in the record before us to determine the particular nature of plaintiffs' claims.

**10.** Section 208(a) of the Refugee Act gives the Attorney General the discretion to grant asylum to an alien who can demonstrate a "well-founded fear of persecution." Section 243(h) of the Immigration and Nationality Act, as amended by section 203(e) of the Refugee Act, prohibits the Attorney General from deporting an alien whose life or freedom would be threatened. *See generally, Bolanos–Hernandez v. Immigration and Naturalization Serv.,* 767 F.2d 1277, 1280–83 (9th Cir.1984). Neither provision makes any reference to the specific nationality of the applicant.

eligibility for relief. In effect, it would appear that Congress has instructed the Executive that nationality may not be considered when applying section 208(a) of the Refugee Act and section 243(h) of the Immigration and Nationality Act.[11] The Executive's allegedly chronic failure to abide by its Congressional mandate could constitute a denial of the equal protection of the laws. Defendants offer no evidence to contradict these allegations, nor do they attack this claim as legally insufficient. The defendants' motion to dismiss this aspect of plaintiffs' equal protection claim is also denied for this reason.[12]

### E. Constitutional Tort Claim

The fourth cause of action asserted by plaintiff refugee organizations and individual refugees alleges that the defendants recklessly endanger Salvadorans and Guatemalans by "wrongfully and willfully" sending them back to their homelands, where they are threatened by "wrongful death, assault, battery and intentional infliction of emotional harm." FAC ¶ 66. The defendants characterize this cause of action as asserting a garden-variety tort and then attack the claim on a variety of grounds. First, they assert that plaintiffs have failed to set forth the jurisdictional basis for the claim. Second, they raise the defense of sovereign immunity. Third, they argue that Congress has occupied the

field of immigration law, leaving no room for federal common law remedies. Finally, they assert that if the tort action arises under the due process clause of the Fifth Amendment, innumerable courts have held that the procedures set forth in applicable immigration laws provide all the process that is due.

■ The plaintiffs respond that they present a tort action arising from their right to *substantive* due process under the Fifth Amendment, in the manner of *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Fourth Amendment), *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (equal protection component of Fifth Amendment), and *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (Eighth Amendment). So construed, the court clearly possesses federal question jurisdiction to hear plaintiffs' claim under 28 U.S.C. § 1331(a). *See Passman, supra*, 442 U.S. at 236, 99 S.Ct. at 2272. The defendants' other bases for dismissing plaintiffs' *Bivens* action likewise miss the mark.

Finally, plaintiffs imply that *Bivens* stands for the proposition that a cause of action exists under the Constitution any time federal officials violate the Bill of Rights. Such is not the case. Instead, *Bivens* held that a victim of a constitution-

**11.** It is unclear whether the Refugee Act confers a statutorily protected interest in asylum because the language of section 203(a) "leaves the final determination on eligibility to the Attorney General's discretion." *Orantes–Hernandez v. Smith*, 541 F.Supp. 351, 378 n. 33 (C.D.Cal. 1982). With respect to withholding of deportation, however, the Attorney General possesses no such discretion.

**12.** Although we conclude that defendants' motion on plaintiffs' equal protection claim should be denied, further clarification of the basis for the court's decision is appropriate. Plaintiffs cite *Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir.1981), and *Orantes–Hernandez v. Smith*, 541 F.Supp. 351 (C.D.Cal.1982), for the proposition that their equal protection claim derives content from customary international law principles. Apparently, they invite the court to find a substantive due process right to temporary refuge in the United States. These citations are inapposite, however. First, the

*Rodriguez–Fernandez* court relied partly on international law principles and substantive due process to hold that the INS cannot indefinitely imprison excludable refugees pending eventual deportation. *Id.* at 1388. Here, the underlying "norm" of temporary refuge, unlike that of arbitrary and definite imprisonment, has not been adopted by Congress. Second, the *Orantes–Hernandez* court focused upon the right of Salvadorans to be free of coercion in considering whether to voluntarily depart the United States, to receive notice of their right to apply for asylum and to request a deportation hearing. Unlike the present case, the process-oriented questions presented by *Orantes–Hernandez* were particularly well-suited to judicial scrutiny. Neither case provides a basis for finding a substantive right to temporary refuge. In light of the congressional rejection of the temporary refuge norm, we must weigh plaintiffs' assertions that defendants violated their equal protection rights without reference to that purported right under customary international law.

al violation by a federal agent is entitled to recover money damages from the agent when there is neither a special factor counseling hesitation in recognizing such a right nor an equally effective alternative remedy. *See Carlson, supra,* 446 U.S. at 18–19, 100 S.Ct. at 1471–72; *Passman, supra,* 442 U.S. at 245–48, 99 S.Ct. at 2277–79. The parties have cited no cases applying this test to the constitutional interest asserted herein, nor have they addressed this issue in their memoranda, and the court declines to reach this issue on its own initiative.

### III. PLAINTIFFS' DISCOVERY MOTIONS

By oral order dated August 21, 1987, this court stayed the deposition of Raymond Kisor pending the resolution of these motions. Since some of the plaintiffs' claims survive, it is appropriate that discovery move forward. The stay is therefore lifted.

The government earlier represented that Mr. Kisor was extremely busy and that scheduling a deposition was extremely difficult. Plaintiffs responded that they were willing to depose another INS official, provided he or she had adequate knowledge of INS policies, practices and procedures. In light of this apparent willingness to work out an arrangement acceptable to both parties, we hereby order that they meet and confer. They may later seek the court's guidance if it appears that an agreement is unattainable.

Along the same lines, plaintiffs have requested a host of documents and now move to compel the INS to produce them. The INS resists, claiming that the requests are too broad and would pose an undue burden. Counsel for the plaintiffs offered to meet to narrow the document request. Once again, a meet-and-confer session is in order. In the event that the dispute appears intractable, we will entertain plaintiff's motion for the production of documents.

IT IS SO ORDERED.